**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND, and TRUSTEES OF THE MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND, as Fiduciaries, | CIVIL ACTION NO. |
| Plaintiffs, | |
| v. | |
| BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, | **COMPLAINT** |
| Defendant. | |

**INTRODUCTION**

1.      This is a case of a fiduciary violating its fiduciary duties and thwarting its co-fiduciary at every turn to avoid revealing the extent of its misconduct. The defendant is Blue Cross Blue Shield of Massachusetts ("BCBSMA"). Plaintiffs Massachusetts Laborers' Health and Welfare Fund (the "Fund") and the Trustees of the Fund ("Trustees") hired BCBSMA to perform health insurance administrative services for the self-insured health benefit plan the Fund provides, including by making benefit determinations with respect to how much in Fund assets should be used to reimburse health care providers for services provided to the Fund's insureds. BCBSMA's agreement to provide those services conferred onto it certain fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* One such duty was to act solely in the interest of participants and beneficiaries of the insurance plan. Instead, BCBSMA prioritized its relationships with healthcare providers and its own bottom line. BCBSMA regularly

priced health insurance claims in violation of its own governing payment policy, causing the Fund to overpay millions of dollars to healthcare providers.

2.      When the Fund brought errors to BCBSMA's attention, BCBSMA had one of two responses. In some cases, it denied the existence of any error—claiming that secret contracts set forth different billing rates for individual healthcare providers—and refused to allow the Fund to review those contracts or how BCBSMA applied its billing policies and procedures to verify this explanation. In other cases, BCBSMA agreed that it or a provider had made a billing error but that BCBSMA's system could not reverse the overpayment; instead, BCBSMA's auditing system would automatically catch the error months later and retain an unauthorized 30% finder's fee for "catching" the error. Furthermore, when the Trustees—in an exercise of their fiduciary duties to the Fund and its insureds—attempted to independently recover overpayments made to providers, BCBSMA demanded that the Fund cease those efforts and also instructed the providers to disregard the Fund's requests for repayment.

3.      BCBSMA allowed millions of dollars of billing errors to deplete the Fund's assets and obstructed the Fund's efforts in recovering overpayments. BCBSMA failed to correct the systemic issues that gave rise to such costly errors in the first place. Despite Plaintiffs' efforts to work with BCBSMA, BCBSMA has refused to cooperate. BCBSMA continues to operate under a cloak of secrecy and refuses to provide any transparency to its co-fiduciary, the Trustees. The only conclusion Plaintiffs can reach with the information BCBSMA will provide is that BCBSMA caused millions of dollars in claim overpayments in violation of the available payment rules. Plaintiffs' best efforts to resolve those issues through good faith negotiations with BCBSMA failed as a result of BCBSMA's repeated refusal to provide any reasonable level of transparency underlying its decision-making process with respect to the allocation of Fund assets toward

medical expenses. Plaintiffs file suit against BCBSMA for its breaches of fiduciary duties, contract, and the covenant of good faith and fair dealing, and for unfair and deceptive business practices and acts. Plaintiffs seek legal damages and equitable relief in the form of an accounting and access to key documents, including provider contracts and payment policies.

## PARTIES

4.      The Massachusetts Laborers' Benefit Funds ("Mass Laborers") provides benefits to members of the Laborers' Local Union in Massachusetts and parts of Northern New England. Plaintiff Massachusetts Laborers' Health and Welfare Fund (the "Fund") operates independently within Mass Laborers and its primary function is providing a self-funded health benefit plan (the "Plan") to union members.

5.      The Plan is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), (40)(A)(i).

6.      The Fund is permitted to sue as a separate entity under 29 U.S.C. § 1132(d)(1).

7.      Plaintiff Trustees of the Fund ("Trustees") are the formally designated "administrator" and "named fiduciary" of the Fund, as defined under ERISA, 29 U.S.C. § 1002(16). As fiduciaries under ERISA, the Trustees are entitled to sue for appropriate relief under 29 U.S.C. § 1132. Unless otherwise specified herein, the use of the term "the Fund" refers generally both to the Fund itself and to the Trustees.

8.      Defendant Blue Cross Blue Shield of Massachusetts ("BCBSMA") is a licensed health insurance company in the Commonwealth of Massachusetts and an Independent Licensee of the Blue Cross Blue Shield Association.  It is headquartered at 101 Huntington Avenue, Suite 1300, Boston, MA 02199-7611.

9.      BCBSMA serves as the Fund's claims administrator and fiduciary in handling benefit claim pricing, determinations, notifications and payments, and managing Fund assets.

## JURISDICTION AND VENUE

10.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this case arises under ERISA, 29 U.S.C. § 1132(e) and involves an ERISA plan. Alternatively, the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue in the District of Massachusetts is proper because BCBSMA is headquartered in Massachusetts, Plaintiffs are present in this district, the claims submitted on behalf of Fund beneficiaries were processed in Massachusetts, and the events at issue took place in Massachusetts. Similarly, the Court has personal jurisdiction over BCBSMA because it is headquartered here.

## FACTUAL ALLEGATIONS

### The Fund Offers a Self-Funded Health Insurance Plan to Its Union Members

12.     Mass Laborers provides pension, annuity, health and welfare, and legal service benefits to members of the Laborers' Local Union in Massachusetts and parts of Northern New England. Such health and welfare benefits are provided pursuant to a self-insured health plan (the "Plan"). The Fund's primary role is to provide the Plan.

13.     A self-insured or self-funded plan is one in which the employer, or in this case a multi-employer group managed by Mass Laborers, directly assumes the financial risk for providing healthcare benefits to its employees. All health insurance expenses are therefore paid out of the employer's assets, which include employer and employee contributions. In contrast, a fully insured plan is one in which the employer purchases an insurance contract from a health insurer for a set premium (paid by the employer and/or employees), meaning that the health insurer directly assumes the financial risk of providing healthcare benefits to employees.

4

14.     Here, the Plan participants are union members and therefore not employees of the same employer. The funding for the Plan is drawn completely from contributions from union members' diffuse employers. Employer-financed benefits are part of members' union benefits. The Fund holds the employers' contributions in trust and uses them to provide the Plan and pay for the covered medical services received under the Plan by the Fund's insureds. Union members make no such contributions except for in rare situations.

15.     Though all contributions to the Plan's assets come from union members' employers, union members are financially impacted by the healthcare costs incurred by the Fund. As health and welfare costs increase, so does the amount of health benefit deductions in members' paychecks.

16.     Most self-insured plan providers contract with a third-party administrator to administer the policy, including by setting up a network of providers, processing the claims, and determining the amount of benefits owed by the employer.

17.     The Trustees have responsibility for administering the Plan and are thus collectively an ERISA fiduciary that owes fiduciary duties to the Plan and its insureds.

**The Trustees Hire BCBSMA to Administer the Fund, Making BCBSMA an ERISA Fiduciary**

18.     The Trustees selected and hired BCBSMA to provide certain third-party administrative services for the Plan, namely claims administration services.

19.     The May 2006 Administrative Services Account Agreement ("ASA") between BCBSMA and the Fund is the foundational document governing this arrangement. BCBSMA and the Fund have renewed the ASA annually.

20.     The ASA delegates to BCBSMA certain responsibilities that the Fund would otherwise retain, including but not limited to handling and pricing claims, making medical policy

and authorization determinations, paying claims, recordkeeping, issuing benefit determination notifications, and managing, controlling, receiving, handling, and then disposing of Plan assets. BCBSMA assumed these responsibilities, engaged in these activities, and therefore became an ERISA fiduciary.

21.     BCBSMA charges the Fund a monthly administrative charge for providing these services.

22.     Under the ASA, the Fund must pay BCBSMA a weekly "working capital amount" that is BCBSMA's "estimate of the amount needed to pay claims on a current basis."

23.     BCBSMA pays healthcare providers directly from this working capital amount, which BCBSMA holds in trust.

24.     BCBSMA performs a monthly settlement calculation to determine whether a settlement amount is owed to the Fund—and therefore applied as a credit to its next weekly working capital payment; or if a settlement amount is owed by the Fund—necessitating an increase in the next payment by the Fund.

25.     As a result of the duties BCBSMA has assumed as the claims administrator on behalf of the Fund, it makes the final determination as to how much of the Fund's assets are used to pay providers for health services offered to the Fund's insureds. As detailed herein, BCBSMA keeps close control over how it makes those decisions, such that the Fund has no ability to verify or control how its own assets are used. As a result of exercising discretionary authority or control over the Fund's management or assets, BCBSMA is operating as a fiduciary under ERISA.

**BCBSMA Ignores and/or Introduces Pricing Errors on the Front End**
**and Recovers a 30% Fee for "Discovering" Them on the Back End**

26.     When a Plan participant receives healthcare, the claim goes directly to BCBSMA, which prices it after applying BCBSMA's own medical policy guidelines, payment policy

6

guidelines, and private provider contracts. BCBSMA then sends the claim information and the cost it assigns to the claim to the Fund.

27.     The Fund, until January 2020, had access to only BCBSMA's medical policy and payment policy guidelines, although it did not have access to how BCBSMA interpreted or applied those policies. The Fund has never had access to the private provider contracts, which are contracts between BCBSMA and individual providers that set forth completely different healthcare service rates than those in BCBSMA's operative payment policy. Accordingly, the Fund has no way of knowing whether BCBSMA is actually pricing claims in accordance with the applicable guidelines and contracts.

28.     Once the Fund receives the price from BCBSMA, the Fund reviews the claim to determine whether the Plan's policy covers the healthcare service at all. For example, the Fund reviews whether the healthcare service arose from a workplace injury, in which case the Fund might not cover the expense since the employer's workers' compensation insurance should cover it instead. If the Plan covers the healthcare service, then the Fund pays the claim in the amount BCBSMA decided. The Fund does not have access to the underlying information required to question or verify the amount of benefit payments that BCBSMA authorizes. Based on the final claim price BCBSMA provides, the Fund decides the copayment, deductible, and coinsurance exclusions for the Plan participant.

29.     BCBSMA is obligated by law to accurately price claims and regularly review past claims for errors or fraud and pursue payment recovery on them.

30.     Pursuant to the ASA, in the case of an erroneously paid claim, BCBSMA is required to reimburse the Fund for the full amount of the incorrect payment if that payment "was made in whole or in part on erroneous claim information originated" by BCBSMA or through any other

error by BCBSMA. BCBSMA therefore has a clear incentive to block the Fund's ability to identify errors that BCBSMA has made, since BCBSMA is responsible for reimbursing the Fund for any overpayments resulting from such errors. As detailed herein, BCBSMA has done just that, by acting repeatedly to preclude the Fund from exercising its fiduciary duties to ensure that its assets have been properly expended under the Plan.

31.    BCBSMA conducts payment recovery processes and audits of its own, through which it identifies erroneous claim payments it directed the Fund to make to providers. Pursuant to the ASA, BCBSMA receives a recovery fee of 20% of any amount recovered on an overpaid claim that was the product of fraud or was otherwise discovered through "appropriate recovery operations." BCBSMA only receives the recovery fee if the payment was "attributable to a third party and not attributable to an error made by" BCBSMA. Under the ASA, the Fund is entitled to receive the full recovered amount for overpayments made due to BCBSMA errors, even if BCBSMA caught the error using its own process.

32.    Without notice or consent, BCBSMA increased its recovery fee from 20% to 30% in 2018. In February 2021, after the Fund inquiried about the unauthorized fee increase, BCBSMA presented a letter dated July 2, 2018 purportedly to authorize the increase, but the Fund never received that notification. The letter included a proposed amendment to the ASA, which, among other things, increased BCBSMA's recovery fee from 20% to 30%. BCBSMA stated that this amendment would be effective only when it received a signed copy of the amendment from the Fund. Since the Fund never received the letter, they never signed the amendment or returned it to BCBSMA. BCBSMA acknowledges that it never received a signed copy of the amendment from the Fund. The recovery fee increase is therefore unauthorized, such that any recovery by BCBSMA based on the 30% fee, instead of 20%, is improper and should be returned.

33.     The Fund has identified numerous instances of BCBSMA causing an error itself, catching it, then fixing it. In such situations, all of the payment recovered must go back to the Fund. The ASA does not permit BCBSMA to collect any money for fixing an error it caused. But BCBSMA has nevertheless made a practice of charging the unauthorized recovery fee in these unauthorized situations. For example, on January 20, 2020 BCBSMA priced a claim at $32,980.60 and transmitted this information to the Fund. On April 20, 2020, BCBSMA sent the Fund an adjustment on this claim, increasing the price to $35,206.96 due to a "provider billing error." But the billed amount from the provider had not changed. On October 29, 2020, BCBSMA transmitted yet another adjustment. This time, BCBSMA decreased the price to $34,365.05 and stated that the adjustment was due to a "pricing change." Again, the billed charges remained the same. On information and belief, the errors necessitating the adjustments were caused by BCBSMA, not the provider. In the end, the third price BCBSMA provided the Fund constituted a savings of $841.91 from the second price. BCBSMA retained a 30% fee on the $841.91, therefore charging $252.57 to correct its own error.

34.     BCBSMA does not provide the Fund with sufficient information or opportunity for it to audit or review BCBSMA's work, including with respect to how it calculates the recovery fee it charges the Fund. Nevertheless, on multiple occasions and during the regular course of business, the Fund discovered errors BCBSMA made when pricing claims.

35.     One such error involved BCBSMA's inpatient readmission policy, which provides that if a patient is readmitted to a hospital within seven days of discharge and the readmission is for a related diagnosis, the cost of the second hospital stay will be included in the price of the initial admission. Hospitals typically bill events like this as two separate hospital admissions. BCBSMA is familiar with this and has two separate stages in its internal claims pricing process to catch the

two admissions and bridge them into one. Nevertheless, in December 2020, the Fund found numerous claims in which BCBSMA incorrectly priced such events as two separate hospital admissions, therefore directly violating its own inpatient readmission policy and inflating healthcare costs for the Fund.

36.     The Fund brought this pricing error to BCBSMA's attention. BCBSMA informed the Fund that it would not be able to re-price the claim and correct the error on the front end to avoid overpayment to the provider. BCBSMA also stated it would not immediately seek recovery on those payments, as required by the ASA. Instead, BCBSMA said it would catch the error months later during its scheduled internal audit. This means that when BCBSMA finally "catches" the error during its audit, it will collect the overpayments, and retain a 30% recovery fee for finding this error, even though the error was clearly caused by BCBSMA's failure to apply its own billing policy.

37.     One such example took place in 2019, when BCBSMA incorrectly priced two claims in violation of its inpatient readmission policy. Rather than bridge the two hospital admissions into one, BCBSMA priced them as two distinct admissions: $21,494.95 for the first and $63,599.28 for the second. In July and August 2019, BCBSMA discovered this error during its provider audit, retracted the first admission, charged a 30% recovery fee of $6,381.21 on it, and retracted the second admission. BCBSMA then sent the Fund a bridged claim, which it priced as $63,599.28 for both admissions.

38.     On September 26, 2019, the Fund contacted BCBSMA and explained that BCBSMA had improperly collected the $6,381.21 recovery fee because BCBSMA had fixed an error BCBSMA itself had caused. BCBSMA responded in agreement and explained that it had adjusted the claim using an incorrect code, which generated the recovery fee. BCBSMA "intended

to" adjust the claim with a different code that "would not have resulted in a recovery fee being charged." BCBSMA stated "the Fund should be credited this fee." To date, BCBSMA has not credited the Fund for the $6,381.21 BCBSMA has acknowledged is owed. This is just one example of the many recovery fees BCBSMA wrongfully collects after fixing errors it introduces.

39.     BCBSMA has systematized profiting off of willful ignorance. It has built a system in which it prices claims based off of data it knows is incorrect, later corrects claim pricing to what it should have been in the first place, and then collects a recovery fee for "catching" the error. BCBSMA has revealed its deceptive practice in at least one formal document—the Outpatient Surgical Payment Policy. BCBSMA contributes to pricing errors by misapplying claims data or using data it knows to be wrong. Although the ASA prohibits BCBSMA from profiting off of this conduct by taking a recovery fee, BCBSMA has attempted to circumvent that provision by "reserv[ing] the right . . . to adjust claim payments."

40.     The Fund hired BCBSMA to price its claims because the Fund is not structured to handle claims pricing and editing in-house. As a result, the Fund does not closely inspect every claim BCBSMA processes. The erroneously priced claims the Fund has reported to BCBSMA have been discovered by chance in the course of the Fund's regular business. These erroneously priced claims therefore likely represent just a small percentage of all claims incorrectly priced by BCBSMA.

41.     Further frustrating the Fund's ability to evaluate whether BCBSMA is properly pricing claims is the lack of access the Fund has to the documents that set forth pricing rules. The Fund has never had access to the private contracts BCBSMA has with providers. Moreover, in January 2020, BCBSMA removed its general payment policies from its public website and moved them to the BCBSMA provider portal, to which the Fund does not have access. On January 9,

2020, the Fund asked for access to the general payment policies, which is necessary to allow the Fund to exercise its fiduciary duties to ensure that its assets are properly being expended. BCBSMA refused to provide the Fund with the payment policies. Accordingly, the Fund has no current information about how BCBSMA determines the cost of the healthcare services Plan participants receive and the Fund pays for.

**The Fund Hires ClaimInformatics to Conduct a Regular Audit**

42.     As part of the Fund's regular audits of its contractors, the Fund hired ClaimInformatics, LLC ("ClaimInformatics"), a corporation that provides healthcare claim payment review services to discover and recover improper payments in healthcare claims. On July 24, 2018, the Fund hired ClaimInformatics to perform a payment integrity review of the Fund's claims as processed and paid by BCBSMA.

43.     ClaimInformatics was tasked with reviewing all claims BCBSMA priced and processed on behalf of the Fund between 2016 to 2018, evaluate BCBSMA's administration of the Plan, identify overpayments, and pursue recovery on overpaid claims from the review period.

44.     After just the first stage of its review, ClaimInformatics identified 5,574 claims that had been paid in error and concluded that the Plan had overpaid providers by at least $1,402,687.57 as a result. ClaimInformatics also found that Plan participants and beneficiaries had been overcharged (through deductibles and coinsurance, for example) by at least $32,810.74.

45.     The Fund performed a due diligence check of ClaimInformatics' findings and agreed with ClaimInformatics' conclusions.

46.     One pricing error uncovered by ClaimInformatics was overpayments for observation room stays, which hospitals use to periodically monitor and observe patients rather than admit them to the hospital. BCBSMA's observation room billing policy at all relevant times

was to charge a one-day rate for observation room stays up to 24 hours and a two-day rate for stays longer than 24 hours, with an absolute cap at the two-day rate.

47.     In its investigation, ClaimInformatics found numerous observation room stays that were less than 24 hours long, but that were erroneously paid as two-day stays under the two-day rate. This error was caused by BCBSMA relying on the date span, rather than the actual hours, of the observation room stay. For example, a patient who was in an observation room from 10 PM one night until 1 AM the following day would have been in the observation room for just three hours. But in situations like this, BCBSMA regularly relied on the two-day date span rather than the complete timeline and would have priced a three-hour stay as a two-day visit in contravention of its own policy, such that BCBSMA would have improperly used Fund assets to pay the hospital for a two-day rate instead of the proper single-day rate.

48.     BCBSMA was aware of this systemic error and had even pursued partial recoveries with the hospitals for this category of overpayment. On various dates between September 2017 and September 2018, BCBSMA reimbursed the Fund for $124,000 overpaid due to this error. But this was just the tip of the iceberg. After reviewing each claim and contacting hospitals directly, ClaimInformatics found that the Fund had overpaid an additional $505,612 due to BCBSMA's incorrect pricing of observation room stays. BCBSMA refuses to credit the Fund for the remaining $505,612 in observation room overpayments. This means that BCBSMA has reimbursed the Fund for just under 20% of the total overpayment and that 80% of the overpayment remains unaccounted for.

49.     On information and belief, BCBSMA reached private settlements with these hospitals on this issue without the Fund's input or consent, and then used those funds to compensate for a small portion of the Fund's losses. The settlements grossly undercompensate the

Fund for errors that BCBSMA caused or should have corrected in its pricing process. Significantly, regardless of whether BCBSMA was able to recover any of the overpayments from the hospitals, it owed the Fund the entire amount, since the overpayment was a direct result of BCBSMA's own error in failing to apply its own, clearly identified payment policy. This one category of error and the low settlement amount indicate that BCBSMA prioritizes its relationships with in-network providers in contravention of its fiduciary duties and to the financial detriment of the Plan, which has yet to be made whole.

50.     In addition to the observation room error, ClaimInformatics also identified a striking pattern of BCBSMA pricing claims at higher amounts than healthcare providers actually billed them. In just one of many examples, a hospital billed $38,786 for a claim. BCBSMA then priced that claim at $120,614—three times the billed charge.

**BCBSMA Blocks the Fund from Recovering Overpayments**

51.     The Fund authorized ClaimInformatics to pursue recovery of the $1.4M in overpayments ClaimInformatics identified in its first stage of review. It did so in recognition of the fact that these were overpayments of the Fund's assets, and in the exercise of the Fund's fiduciary duties to the Plan and its insureds.

52.     In March 2019, ClaimInformatics and the Fund sent letters to each provider believed to have been overpaid, notifying the provider of the overpayment, giving the basis for the belief of overpayment, and providing an opportunity to appeal.

53.     By April 2019, ClaimInformatics was in direct communication with a majority of these providers and had started to receive refund checks from providers who agreed that the Fund had overpaid them. Within the first thirty days of recovery, ClaimInformatics collected $77,337.83 from providers. To date, ClaimInformatics has collected $204,772 in refund checks.

54.     On April 2, 2019, BCBSMA demanded that the Fund cease its recovery efforts. Christopher May, the Fund's account representative at BCBSMA, told the Fund to immediately stop communicating with providers, claiming that such communications were "not allowed" under the ASA, even though the ASA contains no such prohibition and the Trustees have a fiduciary duty to ensure that BCBSMA is appropriately administering the Plan.

55.     While the Fund did not agree with BCBSMA that the effort to collect the overpayments was improper, the Fund nevertheless complied with BCBSMA's demand. At the direction of the Fund, ClaimInformatics immediately ceased direct communications with providers. But by doing so, the remainder of the overpayments the Fund and ClaimInformatics identified in the first stage of review could not be recovered.

56.     Around this time, BCBSMA contacted all of its network providers and instructed them to ignore any notices of overpayments sent by the Fund. Some providers reached out to ClaimInformatics and shared that BCBSMA had advised them not to send any refund checks to the Fund, even though those providers agreed that they had received overpayments. Notably, BCBSMA never followed up on those identified overpayments to ensure that the funds would be returned to the Fund.

57.     On April 24, 2019, Brian Fox, Assistant General Counsel of BCBSMA, wrote a letter reiterating that the Fund should not contact any providers directly.

**BCBSMA Rejects ClaimInformatics' Findings and Stonewalls Attempts to Corroborate That It Correctly Processed All Claims**

58.     ClaimInformatics continued to comb through the claims BCBSMA processed for the Fund and identified numerous suspiciously or blatantly erroneously priced claims. Throughout this process, the Fund regularly notified BCBSMA of ClaimInformatics' findings and concerns in

hopes that BCBSMA would work with the Fund and ClaimInformatics to find common ground and resolve the errors.

59.     To help with this process, ClaimInformatics gave BCBSMA a detailed file containing a sample of 233 of the 5,574 claims that comprised the $1.4M in identified overpayments. ClaimInformatics narrowed these claims down even further into 80 sample claims that represented the key pricing issues discovered. One area of concern involved Severity of Illness ("SOI") adjustments. Hospitals use SOI codes to classify patients into levels 1, 2, 3, and 4 (i.e. minor, moderate, major, and extreme), which identify how sick a patient is and what burden of illness the patient presents. For example, someone with an SOI of 1 is asymptomatic, requires only noninvasive diagnostic or minor therapeutic procedures, and responds promptly to treatment. In contrast, a person with a level 4 SOI has catastrophic manifestations of illness, requires emergency life support, and has no response to treatment. When a hospital bills claims to the insurer, it uses the SOI to adjust the contracted rate for the specific healthcare event. Thus, the cost of a healthcare procedure for a patient with a level 4 SOI will be higher than the cost of that same procedure for a patient with a level 3 SOI.

60.     In its review, ClaimInformatics noticed an unusual number of claims with level 4 (the highest) SOI adjustments. ClaimInformatics suspected that some hospitals were upcoding— or inflating the cost of the healthcare services by baselessly classifying patients at higher SOIs. ClaimInformatics could easily determine whether the hospitals actually engaged in billing improprieties by auditing the suspect bills and reviewing the medical records to confirm whether the patients were classified under the correct SOIs. ClaimInformatics and the Fund asked BCBSMA to let them investigate the suspect claims and obtain the relevant records. BCBSMA refused. Later, BCBSMA stated it audited the claims and that all the SOIs were correct.

ClaimInformatics and the Fund asked to see the audit records and medical records to verify BCBSMA's findings. BCBSMA refused to provide these records. In some cases, BCBSMA said no audit records existed. As a result, BCBSMA prevented the Fund from being able to verify whether its own assets were being improperly expended as a result of BCBSMA's failure to properly administer and pay the claims.

61.     ClaimInformatics' concern that hospitals had upcoded SOIs was warranted. A recent report by the Office of the Inspector General of the U.S. Department of Health and Human Services (the "Department") concluded that "[s]tays at the highest severity level are vulnerable to inappropriate billing practices, such as upcoding-the practice of billing at a level that is higher than warranted." *Trend Toward More Expensive Hospital Stays in Medicare Emerged Before COVID-19 and Warrants Further Scrutiny*, Office of Inspector General, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Feb. 19, 2021), https://www.oig.hhs.gov/oei/reports/OEI-02-18-00380.asp ("Report"). The Report details a number of improper SOI billing practices and calculates their prevalence based on the Department's 2014 to 2019 study. The Report recommends "targeted reviews" of hospital stays that are "vulnerable to upcoding, as well as the hospitals that frequently bill for them." Though the Report predates ClaimInformatics' discussions with BCBSMA, ClaimInformatics' attempts to audit and verify these suspect claims align with the recommendations set forth in the Report. Despite the legitimacy of ClaimInformatics' concerns, BCBSMA refused to allow ClaimInformatics or the Fund to review these SOI level 4 claims. BCBSMA has therefore completely blocked the Fund from examining whether the hospitals it pays have engaged in a recognized and prevalent form of healthcare billing abuse.

62.     Had BCBSMA properly exercised its obligations to Mass Laborers, it would have identified these problems in advance, so as to avoid overpayment being made with Mass Laborers'

funds. BCBSMA blocked ClaimInformatics' attempts to review even the most obviously incorrect claims, thereby allowing such errors to remain hidden. One such claim was billed as two distinct healthcare services: the hospital billed it as a foot amputation and the doctor billed it as a toe amputation. ClaimInformatics asked BCBSMA to audit this claim since one of the charges was necessarily incorrect. BCBSMA later asserted that it conducted an audit, which purportedly revealed that the doctor erred and that the amputation was of the foot. Based on its experience in the field, ClaimInformatics doubted that the doctor had made such a glaring error and billed a less complex procedure than actually performed. ClaimInformatics accordingly requested to review the audit report and medical records to verify BCBSMA's finding. Once again, BCBSMA refused to provide any documentation and therefore blocked the Fund from verifying a blatant claim error.

63.    Throughout the parties' communications, the Fund and ClaimInformatics made clear that they would be unable to validate BCBSMA's findings without the necessary documentation, including BCBSMA's individual contracts with network providers, the newly concealed payment policies, audit reports, and medical records.

64.    Throughout these discussions, BCBSMA steadfastly maintained that ClaimInformatics' findings were wrong. BCBSMA repeatedly asserted that it had processed claims correctly in accordance with confidential contracts with in-network providers. Based on BCBSMA's representations, each of these provider contracts sets forth a rate schedule particular to that provider and distinct from BCBSMA's operative billing policies. But despite the importance of these provider contracts, and the applicable billing policies BCBSMA applied in interpreting the contracts to establish the amount of benefits to be paid by the Fund, and notwithstanding the Fund's repeated requests to see them, BCBSMA refused to let the Fund review the contracts and policies so as to be able to confirm that BCBSMA had not caused the Fund to

overpay claims. BCBSMA also repeatedly brushed aside other concerns by claiming—without any proof or any opportunity for the Fund to verify BCBSMA's assertions—that it had conducted audits that showed that BCBSMA did not err and that no payment recovery would be necessary. Despite the clear answers supposedly uncovered in BCBSMA's audits, BCBSMA refuses to show the Fund the audit records or related medical records to verify BCBSMA's findings.

65.     As ERISA fiduciaries, the Trustees are obligated to take reasonable steps to ensure that the Fund's assets are not being wasted. In this case, numerous red flags were identified concerning a particular claim that appeared to be in error, but BCBSMA is precluding Mass Laborers, through its Trustees, from confirming whether an error took place relating to Mass Laborers' own assets.

66.     On information and belief, BCBSMA committed additional billing errors and erroneously overpaid unknown amounts out of the Fund's assets.

## COUNT ONE
### (Breach of Fiduciary Duty, 29 U.S.C. § 1132(a)(2))

67.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

68.     At all times relevant, and with specific respect to the actions described above, BCBSMA was an ERISA fiduciary. As such, it owed duties of loyalty, care, prudence, and candor to other fiduciaries as well as to Plan participants and beneficiaries. BCBSMA breached those duties by: (1) regularly processing claims in violation of BCBSMA's billing policies; (2) failing to repay the Plan for overpayments it caused; (3) interfering with the Trustees' ability to fulfill their own fiduciary duties by refusing to provide necessary information and interfering with the Fund's recovery efforts; and (4) failing to furnish financial and other relevant information to the Fund.

69.     These breaches, in turn, harmed the Plan and its members by: (1) causing them to pay more than the Plan's terms required, which thereby necessitated more contributions to the working capital account; (2) frustrating their ability to discover and recover Plan overpayments; (3) increasing their own administrative costs by requiring them to spend time and resources addressing BCBSMA's malfeasance; and (4) diminishing Plan assets.

70.     BCBSMA is liable for its breaches of its fiduciary duties to the Plan under 29 U.S.C. § 1109, and has proximately caused substantial damages to Plaintiffs, amounting to millions of dollars in overpayments.

71.     BCBSMA is personally liable to make good to the Fund any losses resulting from its breaches of fiduciary duty and any overpayments caused by BCBSMA's own errors.

72.     Plaintiffs are entitled to other equitable or remedial relief the Court finds appropriate.

73.     Plaintiffs are entitled to an accounting by BCBSMA (1) as part of BCBSMA's fiduciary duties to the Fund and (2) so the Fund may evaluate the extent of BCBSMA's breaches of fiduciary duties and mismanagement of Fund assets.

74.     Plaintiffs are also entitled access to BCBSMA's provider contracts, payment policies, and other supporting documentation so the Fund may finally review paid claims for accuracy and pursue repayment on all claims that BCBSMA erroneously overpaid.

### COUNT TWO
### (Engaging in Prohibited Transactions, 29 U.S.C. § 1132(a)(2))

75.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

76.     At all times relevant, and with specific respect to the actions described above, BCBSMA was an ERISA fiduciary. As such, BCBSMA was prohibited from dealing with the

assets of the Plan in its own interest or for its own account. By doing so, BCBSMA engaged in prohibited transactions under ERISA, 29 U.S.C. § 1106(b)(1).

77.    BCBSMA used Plan assets to serve its own interests in two ways. In the first, BCBSMA kept a 30% recovery fee despite only having authorization to keep 20% of payment recoveries. In the second, BCBSMA retained recovery fees when it corrected claim pricing errors that it caused, thus profiting from its own mistakes in violation of the ASA. BCBSMA's system—in which it conducts claim pricing and overpayment recovery in a black box—is designed with an incentive to allow overpayment-causing errors into the claim pricing process so that BCBSMA can then recover extra fees when such errors are subsequently corrected.

78.    Plaintiffs are entitled to equitable relief to enjoin BCBSMA's prohibited transactions. BCBSMA is also personally liable to the Fund for the losses to the Plan stemming from those transactions.

## COUNT THREE
### (Breach of Fiduciary Duty, 29 U.S.C. § 1132(a)(3))

79.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

80.    This claim is brought under 29 U.S.C. § 1132(a)(3) as an alternative to Count One and Two, which are brought under 29 U.S.C. § 1132(a)(2). Plaintiffs seek relief under Count Three only to the extent the Court finds that such relief is not available to Plaintiffs under Counts One and Two.

81.    At all times relevant, and with specific respect to the actions described above, BCBSMA was an ERISA fiduciary. As such, it owed duties of loyalty, care, prudence, and candor to other fiduciaries as well as to Plan participants and beneficiaries. BCBSMA breached those duties by: (1) regularly processing claims in violation of BCBSMA's billing policies; (2) failing

to repay the Plan for overpayments it caused; (3) interfering with the Trustees' ability to fulfill their own fiduciary duties by refusing to provide necessary information and interfering with the Fund's recovery efforts; and (4) failing to furnish financial and other relevant information to the Fund.

82.     These breaches, in turn, harmed the Plan and its members by: (1) causing them to pay more than the Plan's terms required, which thereby necessitated more contributions to the working capital account; (2) frustrating their ability to discover and recover Plan overpayments; (3) increasing their own administrative costs by requiring them to spend time and resources addressing BCBSMA's malfeasance; and (4) diminishing Plan assets.

83.     Plaintiffs are entitled under 29 U.S.C. § 1132(a)(3)(A) to sue to enjoin any act or practice which violates ERISA or the terms of the Plan, and under 29 U.S.C. § 1132(a)(3)(B) to sue for appropriate equitable relief to redress BCBSMA's violations and to enforce the provisions of ERISA and the terms of the Plan.

84.     Plaintiffs are therefore entitled to a full accounting by BCBSMA (1) as part of BCBSMA's fiduciary duties to the Fund and (2) so the Fund may evaluate the extent of BCBSMA's breaches of fiduciary duties and mismanagement of Fund assets.

85.     Plaintiffs are further entitled access to BCBSMA's provider contracts, payment policies, and other supporting documentation relating to how BCBSMA processes Plan claims and directs Fund assets.

## COUNT FOUR
### (Accounting)

86.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

87.     Pursuant to the ASA, BCBSMA agreed to take on a number of managerial and discretionary responsibilities, which thus rendered it an ERISA fiduciary owing fiduciary duties. Among these duties is the duty to act in accordance with the documents and instruments governing the Plan and to provide an accounting to the Fund upon request.

88.     BCBSMA has repeatedly refused the Fund's requests for the documents and instruments that BCBSMA has indicated govern the Plan. These include the individual provider contracts and BCBSMA's governing payment policy. BCBSMA has further failed to furnish the Fund with any financial information regarding the administration and management of the Plan and Fund assets despite the Fund's repeated requests.

89.     BCBSMA's refusal to provide the Fund with provider contracts, supporting documentation, relevant financial information, and an accounting of processed claims has harmed Plan members by concealing the extent of BCBSMA's misconduct and mismanagement and preventing the Fund from recovering overpaid amounts. Furthermore, BCBSMA has inflated the cost of healthcare, requiring union members' employers to contribute more towards health benefits and thus withhold more money from union members' paychecks.

90.     The Fund is entitled to an equitable accounting in addition to the legal damages sought in the other claims because legal damages will remedy only a fragment of the overpayments BCBSMA has erroneously made over the years.

## COUNT FIVE
### (Breach of Contract)

91.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

92.     The Fund and BCBSMA are parties to the ASA.

93.     The ASA is a valid, legal, binding, and enforceable contract entered into for consideration.

94.     Plaintiffs fully complied with their obligations under the ASA.

95.     In breach of express terms of the ASA, BCBSMA did not process claims in accordance with its own policies, review paid claims for errors or fraud, or reprocess incorrect claims the Fund brought to its attention.

96.     In breach of express terms of the ASA, BCBSMA collected a 30% recovery fee, instead of the 20% agreed to, after collecting overpayments on erroneously paid claims. In further breach, BCBSMA recovered this recovery fee in unauthorized situations.

97.     As a direct and proximate result of the breach, the Fund suffered a significant loss of its assets in addition to the administrative fees the Fund paid BCBSMA for unperformed services.


## COUNT SIX
### (Breach of the Covenant of
### Good Faith and Fair Dealing)

98.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

99.     The Fund and BCBSMA are parties to the ASA.

100.    The ASA is a valid, legal, binding, and enforceable contract entered into for consideration.

101.    A covenant of good faith and fair dealing is implied in all contracts in Massachusetts.

102.    The implied covenant prevents a party from doing anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.

103.    The Fund reasonably understood the ASA to permit either BCBSMA or the Fund to pursue claim recovery for erroneous payments.

104.    The Fund reasonably understood the ASA to include implied promises that neither it nor BCBSMA would obstruct the other's efforts to pursue payment recovery.

105.    The Fund reasonably understood the ASA to establish an agency relationship in which the Fund is the principal and BCBSMA is the agent in pricing claims, directing Fund assets, and pursuing payment recovery.

106.    The Fund reasonably understood the ASA to include implied promises that BCBSMA would share with the Fund all foundational information governing BCBSMA's discharge of its duties under the contract.

107.    BCBSMA acted in bad faith in refusing to give the Fund access to documentation allegedly supporting BCBSMA's repeated yet unsupported assertion that all suspect claims had been priced correctly. BCBSMA acted in bad faith by de-publishing its previously public payment policy once the Fund began inquiring about why so many claims were processed in violation of that policy and refusing to provide that policy to the Fund when requested. BCBSMA acted in bad faith in collecting a 30% recovery fee on overpaid claims when only 20% was authorized and collecting recovery fees in unauthorized situations.

108.    As a direct and proximate result of this breach, the Fund incurred damages in the amount of all overpaid claims that BCBSMA prohibits the Fund from meaningfully identifying and/or recovering.

109.    The Fund is entitled to recover from BCBSMA actual damages as a result of these breaches in an amount to be determined at trial.

110.    The Fund is also entitled to punitive damages as may be assessed by the jury.

111.    Further, the Fund as the principal is entitled to equitable relief from its agent in the form of access to BCBSMA provider contracts and other supporting documentation so that it can assess the agent's performance and methodology in carrying out its contracted duties.

112.    Further, given the agency relationship between the parties, the foundational documents setting forth the agent's methodology in carrying out its duties to the principal belong, or at minimum should be available, to the principal. The Fund is therefore entitled to access BCBSMA's provider contracts and other supporting documentation.

113.    The Fund is also entitled to a full accounting of claims processed by BCBSMA

## COUNT SEVEN
### (Unfair and Deceptive Business Practices, Mass. G.L. 93A § 9)

114.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

115.    This claim is brought under Mass. G.L. 93A § 9.

116.    BCBSMA committed unfair and deceptive business acts and practices when it repeatedly performed contracted duties in violation of the operating payment policy and for its own financial gain.

117.    BCBSMA committed unfair and deceptive business acts and practices by consistently stonewalling its client, the Fund, by refusing to provide the Fund necessary information about claims processing and misdirection of Fund assets.

118.    BCBSMA committed unfair and deceptive business acts and practices by unilaterally amending the ASA in order to collect a higher recovery fee than agreed to. Further,

BCBSMA committed unfair and deceptive business acts and practices by collecting recovery fees in unauthorized situations and failing to return those fees when they were discovered. The system, as designed by BCBSMA, gives it an incentive to allow errors to lead to overpayments so that BCBSMA can then recover extra fees when such errors are subsequently corrected.

119.    On January 15, 2020, Plaintiffs, through their counsel, delivered to BCBSMA a written demand for relief that set forth the unfair and deceptive business acts and practices committed by BCBSMA against Plaintiffs. BCBSMA refuses to provide the relief requested in that letter.

120.    BCBSMA's unfair and deceptive business acts and practices have injured Plaintiffs by (1) depleting Fund assets by causing the Fund to overpay claims; (2) frustrating their ability to discover and recover Plan overpayments; and (3) increasing the Plan's administrative costs by requiring them to spend time and resources addressing BCBSMA's malfeasance.

121.    BCBSMA's unfair and deceptive business acts and practices are the direct cause of Plaintiffs' injuries because (1) the relationship between the parties required the Fund to blindly rely on BCBSMA's pricing of claims and make payments in accordance with BCBSMA's pricing; (2) BCBSMA instructed in-network providers to cease communication with the Fund regarding overpayment recoveries and the providers complied; and (3) BCBSMA's gatekeeping of crucial and foundational documents is the primary, if not the only, barrier preventing the Fund from identifying the extent of BCBSMA's misdirection of Fund assets and recovering those unidentified overpayments.

122.    Plaintiffs are entitled to legal damages as a result.

## JURY DEMAND

123.    Counts One, Two, and Three above are brought under ERISA, for which Plaintiffs are submitting their claims to the Court for final adjudication in a Bench Trial. For Counts Four through Seven, Plaintiffs hereby demand a Jury Trial for determination of BCBSMA's liability and appropriate remedies.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands the following relief:

(i)     Damages and interest thereon in an amount to be determined at trial;

(ii)    Punitive damages in an amount to be determined at trial;

(iii)   An accounting of paid claims;

(iv)    Access to BCBSMA's provider contracts and other back-up documentation relating to how BCBSMA has processed Plan claims;

(v)     A declaratory judgment that the Fund is entitled to independently pursue claim payment recovery;

(iii)   Reasonable attorneys' fees and costs plus pre- and post-judgment interest in accordance with the foregoing; and

(iv)    Such other and further relief as the Court deems just and proper.

Dated: March 26, 2021                                    Respectfully submitted,

                                                        O'REILLY, GROSSO, GROSS &
                                                        JONES, P.C.

                                                        By:/s/ *James F. Grosso*

                                                        James F. Grosso, Esq.
                                                        1661 Worcester Road, Suite 403
                                                        Framingham, MA 01701
                                                        Tel: 508.620.0055
                                                        jgrosso@ogglaw.com

                                                        ZUCKERMAN SPAEDER LLP
                                                        By:

D. Brian Hufford, Esq.
(*pro hac vice* pending)
Jason Cowart, Esq.
(*pro hac vice* pending)
Leila Bijan, Esq.
(*pro hac vice* pending)
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: 212.704.9600
Fax: 917.261.5864
dbhufford@zuckerman.com
jcowart@zuckerman.com
lbijan@zuckerman.com

*Counsel for Massachusetts
Laborers' Health and Welfare Fund,
Trustees of Massachusetts Laborers'
Health and Welfare Fund*