### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND, and TRUSTEES OF THE MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND, as Fiduciaries,<br><br>Plaintiffs,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,<br><br>Defendant. | CIVIL ACTION NO.: 1:21-cv-10523-FDS<br><br><br><br><br><br>**AMENDED COMPLAINT** |

## INTRODUCTION

1. This case concerns improper in-network benefit payments that an ERISA plan administrator self-servingly caused a self-funded plan to make in contravention of the plan's written terms, based on contracts and rationales over which the administrator has total control, and which it steadfastly refuses to provide to the plan or its co-fiduciaries. More specifically, it concerns an ERISA fiduciary that violated—and continues to violate—its ERISA fiduciary duties and its separate legal obligations under state law.

2. The defendant is Blue Cross Blue Shield of Massachusetts ("BCBSMA"). Plaintiffs Massachusetts Laborers' Health and Welfare Fund (the "Fund") and the Trustees of the Fund ("Trustees") hired BCBSMA to help administer the self-insured health benefit plan (the "Plan") the Fund offers. This arrangement is primarily governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, the terms of the Plan, and the terms

of the Administrative Service Agreement ("ASA") between the parties. BCBSMA has violated—and continues to violate—all three.

3.      The written terms of the Plan are summarized in *A Summary of Plan Features*. With respect to in-network benefits, it provides that the Plan will pay benefits based on the amount negotiated between the Plan's administrator and the provider, and that the amount of the billed charges that will be considered "covered expenses" under the Plan will never exceed the negotiated rates. It also indicates that these negotiated rates are discounts of providers' standard billing rates.

4.      Plaintiffs hired BCBSMA to serve as the Plan's administrator and their arrangement was codified in an "administrative services agreement" or ASA. Among other things, the Plan delegated to BCBSMA the power to interpret the meaning of the Plan's written terms including those related to in-network benefit payment amounts, to cause Plan assets to be used to finance such benefit payments, and to identify and recover any overpayments that are made.

5.      In retaining BCBSMA to assist with the administration of the Plan, Plaintiffs delegated to BCBSMA the duty to maintain a "network" of providers that agree to accept discounted rates for covered services rendered to members of the Plan. BCBSMA maintains such a network by entering into contracts with providers to accept discounted rates from BCBSMA customers, including the Plan, other self-funded plans, and BCBSMA's fully insured plans. BCBSMA has adopted various internal policies and practices that concern the way it will interpret and apply the Plan's written terms and its contract with providers.

6.      Plaintiffs do not challenge BCBSMA's right to enter into such contracts or promulgate such policies. Rather, Plaintiffs challenge BCBSMA's position that it can cause the

Plan to pay millions of dollars in benefits in excess of the amounts called for in those contracts and the Plan's written terms, for reasons that appear to advance BCBSMA's own interests, and that BCBSMA has no obligation to provide Plaintiffs with information related to those violations.

## PARTIES

7.      The Massachusetts Laborers' Benefit Funds ("Mass Laborers") provides benefits to members of the Laborers' Local Union in Massachusetts and parts of Northern New England. Plaintiff Massachusetts Laborers' Health and Welfare Fund (the "Fund") operates independently within Mass Laborers and its primary function is providing a self-funded health benefit plan (the "Plan") to union members.

8.      The Plan is governed by ERISA, 29 U.S.C. § 1002(1), (40)(A)(i).

9.      The Fund is permitted to sue as a separate entity under 29 U.S.C. § 1132(d)(1).

10.      Plaintiff Trustees of the Fund ("Trustees") are fiduciaries under ERISA. They are therefore entitled to sue for appropriate relief under 29 U.S.C. § 1132. Unless otherwise specified herein, the use of the term "the Fund" refers generally both to the Fund itself and to the Trustees.

11.      Defendant Blue Cross Blue Shield of Massachusetts ("BCBSMA") is a licensed health insurance company in the Commonwealth of Massachusetts and an Independent Licensee of the Blue Cross Blue Shield Association.  It is headquartered at 101 Huntington Avenue, Suite 1300, Boston, MA 02199-7611.

## JURISDICTION AND VENUE

12.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this case arises under ERISA, 29 U.S.C. § 1132(e) and involves an ERISA plan. Alternatively, the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue in the District of Massachusetts is proper because BCBSMA is headquartered in Massachusetts, Plaintiffs are present in this district, the claims submitted on behalf of Fund beneficiaries were processed in Massachusetts, and the events at issue took place in Massachusetts. Similarly, the Court has personal jurisdiction over BCBSMA because it is headquartered here.

## FACTUAL ALLEGATIONS

### The Fund Offers a Self-Funded Health Insurance Plan to Its Union Members

14.     Mass Laborers provides pension, annuity, health and welfare, and legal service benefits to members of the Laborers' Local Union in Massachusetts and parts of Northern New England. Such health and welfare benefits are provided pursuant to a self-insured health plan (the "Plan"), meaning that Mass Laborers directly assumes the financial risk for providing healthcare benefits to its employees.

15.     The plan assets used to finance such benefit payments are drawn completely from contributions from union members' diffuse employers. Such employer-financed benefits are part of members' union benefits.

16.     Although all contributions to the Plan's assets come from union members' employers, union members are financially impacted by the healthcare costs incurred by the Fund. As health and welfare costs increase, so does the amount of health benefit deductions in members' paychecks.

### The SPD Provides the Written Terms of the Plan

17.     The Plan's written terms are summarized in the Summary Plan Document ("SPD"), titled *A Summary of Plan Features*.

18.    The SPD states the following regarding the existence and financial benefit of network providers:

a.    "The Fund has entered into an arrangement with a Preferred Provider Organization (PPO) that contracts with hospitals, physicians and other health care providers to provide you and your dependents with medical services at discounted rates."

b.    "Using a provider who participates in the PPO Network will keep your expenses to a minimum."

c.    "A network provider feature can help you keep your share of the costs down."

d.    "To receive the highest benefit level (in-network benefits) under the Plan you need to choose providers who participate in the BlueCross BlueShield PPO Provider network."

e.    "You'll save the Fund money and help it continue providing benefits because of the discounted prices negotiated with participating pharmacies."

19.    The Plan further provides that BCBSMA provides the PPO "for most medical expenses," thereby negotiating the discounted rates with most in-network medical providers, while the Wellness Corporation deals with behavioral health and complementary care (e.g., massage therapy, biofeedback, and nutrition), and Express Scripts handles pharmaceuticals.

20.    The SPD includes the term "covered charges," which is defined as "the negotiated rate (for PPO providers)." "Covered charges" and "covered expenses" are synonymous.

21.    The SPD defines the bounds of the Plan's coverage for different categories of medical expenses. The coverage levels are determined based on set, category-specific percentages of the underlying medical expense. For example, except for a $15 copayment, the

Plan covers either 90% or 100% of in-network "Hospital-Outpatient" medical expenses. These percentages "apply to **covered charges only**," or as defined above, "negotiated rates."

22.     The SPD also states that "billed charges that will be considered covered expenses will never be more than the negotiated rate" for network providers. In other words, billed charges from a provider are eligible for coverage only if such charges do not exceed negotiated rates. The negotiated rate is therefore the maximum cost.

23.     The Plan further specifies that the insured member "will be responsible for [their] share of covered expenses and any amounts that exceed covered expenses."

24.     Pursuant to the SPD, "covered" expenses include but are not limited to "charges resulting from [an] inpatient stay in a hospital," "outpatient charges for a surgical operation," "pre-admission testing," and "generally accepted surgical procedures." The payable benefits for such services are all determined by BCBSMA, based on its interpretation and application of the contracts it has negotiated with the network providers.

25.     Moreover, the SPD states that "any provider in the PPO network will be paid directly by BlueCross BlueShield," with the member "responsible" for the deductible and any copayment amounts.

26.     The SPD further delegates to BCBSMA substantial additional responsibilities in administering the Plan, including: conducting concurrent review of hospital stays; certifying various services, including hospice care and home health care; and handling all pre-service claims, such as by making pre-authorization decisions for non-emergency hospital admissions, skilled nursing facility admissions, and durable medical equipment, and making retroactive approval of emergency admissions.

27.     Although post-service claims for benefits under the Plan are to be submitted to the Fund, after which BCBSMA will determine the actual amount of benefits to be paid based on its application of the network contracts, the SPD explains that all pre-service and urgent care claims, other than for behavioral services, are to be submitted directly to BCBSMA for determination.

**BCBSMA Agrees to Administer the Plan and Comply with Its Terms and ERISA**

28.     The Trustees hired BCBSMA to provide administrative services for the Plan.

29.     BCBSMA charges the Fund a monthly administrative fee for providing this service.

30.     BCBSMA and the Fund executed a May 2006 Administrative Services Account Agreement ("ASA"). They have renewed the ASA annually. The ASA incorporates all Plan terms and BCBSMA agreed to perform all its duties in accordance with them.

31.     The ASA delegates to BCBSMA certain Plan administration responsibilities that the Fund would otherwise retain, including but not limited to interpreting Plan terms, calculating in-network benefits, and using Plan assets to pay in-network benefits.

32.     The Plan includes a provision relating to "Discretionary Authority of the Board of Trustees and its Designees," in which it states:

> In carrying out their respective responsibilities under the Plan, the Board of Trustees, the Fund Administrator and other individuals with delegated responsibility for the administration of the Plan will have discretionary authority to interpret the terms of the Plan and to determine eligibility and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination will be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

33.     Through the ASA and the Plan (as detailed above), BCBSMA is one of the parties that has been "delegated responsibility for the administration of the Plan," including by being

granted "discretionary authority to interpret the terms of the Plan and to determine eligibility and entitlement to Plan benefits in accordance with the terms of the Plan."

34.     The ASA defines "claim" as "any written or electronic communication submitted to Blue Cross and Blue Shield, according to agreed upon procedure, which requests payment for covered services under the Fund's group health plan and which contains all pertinent information which will allow Blue Cross and Blue Shield to process the aspects of the transaction for which it is responsible under this Agreement."

35.     Pursuant to the ASA, BCBSMA agreed that ERISA governs its obligations to the Plan. In describing the "Duties and Obligations Under ERISA" of the parties to the ASA, it states:

> The Trustees are the "administrator" and "named fiduciary" of the Fund as that term is defined in Section 3(16)(A) and 402(a), respectively, of ERISA. Blue Cross and Blue Shield is engaged as an independent contractor to perform the specific duties and responsibilities which the Trustees delegate to it. It is understood and agreed that Blue Cross and Blue Shield exercises its duties within the framework of the Plan of Benefits established by the Trustees. Blue Cross and Blue Shield and the Trustees of the Fund accept that the definitions of a fiduciary are contained in ERISA Section 3(21)(A).

36.     The ASA also states that "all functions, duties and responsibilities of Blue Cross and Blue Shield are governed by this Agreement, including Attachments A and C, which are used to implement the benefits detailed by the Plan document."

37.     With respect to Attachment A, the ASA states: "The Fund's Plan of Benefits will be administered by Blue Cross and Blue Shield in accordance with the Benefit Description and applicable PPO Schedule(s) of benefits which is incorporated in this Agreement as Attachment A." The ASA then adds that "in the event of a conflict between the Fund's Plan of Benefits and the Benefit Description and applicable PPO Schedule(s), the Fund's Plan of Benefits governs."

38.     The Plan's written terms are therefore incorporated into the ASA.

39.     With respect to the "Blue Cross and Blue Shield Standard of Performance," the

ASA states:

> Blue Cross and Blue Shield will perform its services under this Agreement in a reasonable and prudent fashion and in accordance with the benefits provision of the Plan and as described in this Agreement, so long as the provisions are in compliance with applicable law.

40.     In describing BCBSMA's duties in providing "Claims Determination," the ASA

states:

> Blue Cross and Blue Shield will conduct a medical necessary and utilization review of inpatient urgent, nonurgent, and concurrent care claims using the Blue Cross and Blue Shield medical policy, medical technology assessment guidelines and utilization review policies and procedures as set forth in the Benefit Description as incorporated into the Agreement as Attachment A. The Fund will determine member eligibility, the availability of benefits and claims adjudication based on Blue Cross and Blue Shield's pricing of claims.
>
> Once the Fund, or its designee, receives the claim pricing information from Blue Cross and Blue Shield, or its designee, this claim information will be entered into the Fund's, or its designee's claims processing system. After the claim determination has been made, the Fund, or its designee, will electronically transmit the adjudicated claims information to Blue Cross and Blue Shield for provider payment and reporting. Specifically, the claims process will function as follows:
>
> - **Receipt of Claims.** Blue Cross and Blue Shield will receive and reprice all covered claims submitted by network and out-of-network providers to Blue Cross and Blue Shield in accordance with Blue Cross and Blue Shield's provider reimbursement arrangements as in effect from time to time and consistent with the terms of this Agreement. . . .
>
> - **Processing of Claims.** Blue Cross and Blue Shield will make or cause to be made on behalf of the Fund payment of that portion of the amounts due under the Fund's Plan of Benefits for each claim of a Participant that (i) is submitted to Blue Cross and Blue Shield under the Plan of Benefits; (ii) qualifies for reimbursement under the Plan of Benefits; (iii) has a Claim Incurred Date (generally defined as date of hospital admission or date service otherwise provided) during the terms of this Agreement; and (iv) has been incurred for services provided by a covered provider. Blue Cross and Blue Shield will fulfill its obligations under this Section in accordance with this Agreement, applicable law and Blue Cross and Blue Shield's standard procedures and practices as in effect from time to time. With

respect to each such Claim, Blue Cross will provide an explanation of benefits to the network provider and the Fund will furnish an explanation of benefits form to the appropriate Participant.

41.     The ASA additionally provides that BCBSMA "will provide all aspects of utilization review, including preadmission review and concurrent care review and catastrophic case management." Moreover, under the ASA, "Blue Cross and Blue Shield agrees to provide information to network providers about the terms of the Fund's group health plan and answer specific questions about covered services, benefits and claims inquires on an ongoing basis."

42.     In describing "Claims Processing and Payment," the ASA provides: "Claims involving Fund Participants received by Blue Cross and Blue Shield will be entered into the Blue Cross and Blue Shield claims processing system(s) and priced based on the applicable provider arrangement and in accordance with Section 4 of this Agreement. After (i) applying medical necessity criteria, (ii) applying medical policy criteria and (iii) pricing the claims, Blue Cross and Blue Shield will electronically transmit all claims to Medical Plan Liaisons and the Fund, or its designee, for entering the claims information into the Fund's, or its designee's, claim processing system."

43.     As for Section 4 of the ASA, "Benefits/Claims Liability," the subsection under "Administration of Health Care Benefits" states:

> Blue Cross and Blue Shield will administer health care benefits based on the Fund's Plan of Benefits and the Benefit Description and applicable PPO Schedule(s) of Benefits (to the extent that they do not conflict with the Plan) that are in effect for the Participant at the time the services are furnished and based on contractual agreements with providers and/or vendors.

44.     Another provision of the ASA, entitled "Plan Benefit Changes," specifies that the Fund is obligated to notify BCBSMA of any changes in the Plan. If the Fund fails to provide proper notification of any such change, "and if Blue Cross and Blue Shield cannot modify its

systems and procedures to comply with the change and its effective date, Blue Cross and Blue Shield will not be deemed to have breached this Agreement, or be held negligent under this Agreement."

45.     The ASA provides that, in fulfilling its duties, BCBSMA will act in a "reasonable and prudent fashion" and in accordance with the Plan's written terms. Further, BCBSMA and will properly apply its "standard procedures and practices" with respect to interpreting and applying its provider contracts and making benefit determinations.

46.     As set forth in the ASA, the methodology of calculating the cost of all medical expenses is governed by BCBSMA's "negotiated claim payment rates" and "provider arrangements." These include but are not limited to billing rates and rules, pricing policies, and provider contracts. Pursuant to the SPD, all of these "negotiated rates" calculate the "covered charges" or the "covered expenses." In other words, the rates, rules, policies, and contracts BCBSMA has negotiated with its network providers determine the covered, or eligible, charges. BCBSMA interprets its own negotiated rates, rules, policies, and contracts, which determines what benefit payments will be issued by the Fund.

47.     Under the ASA, the Fund must pay BCBSMA a weekly "working capital amount" that is BCBSMA's "estimate of the amount needed to pay claims on a current basis." BCBSMA pays healthcare providers directly from this working capital amount that consists of Plan assets, which BCBSMA holds in trust. As quoted above, the SPD also states: "Any provider in the PPO network will be paid directly by BlueCross BlueShield." BCBSMA therefore controls the Plan assets in making benefit payments, which is calculated from BCBSMA's interpretation and application of its pricing rates, rules, policies, and contracts.

48.     When a Plan member receives healthcare from a network provider, the claim goes directly to BCBSMA, which determines the covered—or eligible—charges using its framework of pricing policies described above. BCBSMA then informs the Fund of the covered charges. The Fund then reviews the claim to determine whether it is covered under the Plan. For example, if the healthcare service arose from a workplace injury, the Fund might not cover the expense since the employer's workers' compensation insurance should cover it instead. If the Plan covers the healthcare service, then the Fund pays applies the coverage rules set forth in the SPD as to those BCBSMA-decided charges. Based on the final claim price BCBSMA provides, the Fund also decides the copayment, deductible, and coinsurance exclusions for the Plan member. The amount of covered charges is a decision made exclusively by BCBSMA, based on the contracts and internal policies that are solely in its possession and control. Indeed, even when Plaintiffs sees red flags suggesting an overpayment due to fraud or other error, BCBSMA blocks the Fund's access to the underlying coding and pricing rates, rules, policies and contracts and information about how BCBSMA interprets and applies them to claims. Based on the covered charges BCBSMA provides, and over which it has total control, the Fund calculates the copayment, deductible, and coinsurance exclusions for the Plan member.

49.     Under the ERISA regulations issued by the Department of Labor, an "adverse benefit determination" that requires compliance with ERISA's claims procedure regulations, constitutes "a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit" under an ERISA plan. When a benefit payment is issued and a determination is made after-the-fact that the payment was erroneous, or otherwise exceeded the actual covered expenses under the Plan, this constitutes a retroactive ERISA adverse benefit determination.

50.     The ASA details BCBSMA's obligation when there has been an overpayment, or a retroactive adverse benefit determination, in which it is determined that a benefit payment was improperly issued because the claim was not covered or the benefit amount was overstated, as defined by the Plan's written terms. Pursuant to the ASA, if BCBSMA's discharge of its obligations under the Plan causes an erroneous claim payment to be made, "in whole or in part on erroneous claim information originated" by BCBSMA or through any other error by BCBSMA, BCBSMA must reimburse the Fund and therefore Plan assets for the full amount of the overpayment.

51.     BCBSMA conducts payment recovery processes and audits, through which it makes retroactive adverse benefit determinations by identifying circumstances in which BCBSMA erroneously paid Plan assets to providers in a manner that exceeded covered expenses under the Plan. Pursuant to the ASA, BCBSMA receives a recovery fee of 20% of any amount recovered on an overpaid benefit claim issued under the Plan that was the product of fraud or was otherwise discovered through "appropriate recovery operations." BCBSMA only receives the recovery fee if the payment was "attributable to a third party and not attributable to an error made by" BCBSMA. Under the ASA, the Fund is entitled to receive the full recovered amount for overpayments made out of Plan assets and caused by BCBSMA errors, even if BCBSMA caught the error.

52.     Without notice or consent, BCBSMA increased its recovery fee for such retroactive benefit determinations from 20% to 30% in 2018. In February 2021, after the Fund inquired about the unauthorized fee increase, BCBSMA presented a letter dated July 2, 2018 purportedly to authorize the increase, but the Fund never received that notification. The letter included a proposed amendment to the ASA, which, among other things, increased BCBSMA's

recovery fee from 20% to 30%. BCBSMA stated that this amendment would be effective only when it received a signed copy of the amendment from the Fund. Since the Fund never received the letter, they never signed the amendment or returned it to BCBSMA. BCBSMA acknowledges that it never received a signed copy of the amendment from the Fund. The recovery fee increase is therefore unauthorized, such that any recovery by BCBSMA based on the 30% fee, instead of 20%, is improper and must be returned.

**BCBSMA Uses Concealment, Discretion, and Control to**
**Violate the Plan and Improperly Direct Plan Assets**

53.     Until January 2020, BCBSMA gave the Fund access to some of its payment policy– related guidelines by posting them on its public website. But BCBSMA has consistently refused to provide access to ***all*** of the internal policies and procedures that bear upon in-network claim pricing calculations, which is essential information that determines the benefit payments for in-network services. In other words, even though Plan assets are being used to pay benefits for network services, BCBSMA blocks access to the internal policies and procedures that are relied upon in making those benefit determinations under the Plan.

54.     In January 2020, BCBSMA removed the limited information on its public website about how BCBSMA prices in-network claims in making its benefit determinations. On January 9, 2020, the Fund asked for access to it, which is necessary to ensure that benefit payments do not exceed the amounts called for by the Plan's written terms. BCBSMA refused to provide the Fund with the information, leaving total control of this aspect of the benefit determination process in the exclusive hands of BCBSMA.

55.     The Fund has never had access to BCBSMA's private provider contracts, which are contracts that set forth deviations from the rules, rates, and policies in BCBSMA's operative payment policies. BCBSMA has denied every request the Fund has made to see these provider

contracts. As such, it is impossible for Plaintiffs to verify the full extent to which BCSMA complies with its obligation to properly interpret and apply Plan terms, including that all network benefits cannot exceed negotiated charges.

56.     BCBSMA actively conceals all documents and information that govern BCBSMA's methodology for determining covered charges under the Plan and amounts paid to network providers. The Fund has no access to these documents. By independently crafting this methodology and hiding it from the Fund, BCBSMA has complete discretionary authority.

57.     In addition, BCBSMA has and exercises total control over Plan assets that are used to fund in-network benefit payments because BCBSMA has and exercises the power to both determine the amount of covered charges and cause resulting benefit payments to be paid from Plan assets.

58.     Over the years, the Fund has often asked BCBSMA about how it calculated the amount of covered charges for specific claims. In those instances, the Fund has sought additional information to verify that the covered charges BCBSMA calculated were in accordance with the written Plan terms and operative pricing rates, rules, policies, and contracts. But BCBSMA never provides the necessary information. Instead, BCBSMA provides empty assurances that the claims were processed correctly. BCBSMA thus forces the Fund to approve or deny final claim amounts based on information BCBSMA knows is incomplete and insufficient. BCBSMA therefore holds de facto power over final benefit determinations.

59.     BCBSMA performs a monthly settlement calculation to determine whether a settlement amount is owed to the Fund—and therefore applied as a credit to its next weekly working capital payment; or if a settlement amount is owed by the Fund—necessitating an

increase in the next payment by the Fund. As a result of BCBSMA's complete discretionary authority and concealment, BCBSMA controls Plan assets using these monthly payments.

60.     For the purposes of the claims herein, BCBSMA is an ERISA fiduciary, as defined under 29 U.S.C. § 1002(21)(A), and owes all resulting ERISA fiduciary duties including the duty to honor written Plan terms, and the duty to exercise its discretion loyally, with care and prudence, and to be candid with other Plan fiduciaries and Plan members.

**The Fund Uncovers BCBSMA's Violations of Plan Terms, Fiduciary Duties, and State Law**

61.     In recent years, the Fund has audited and otherwise reviewed BCBSMA's performance of its responsibilities to the Plan. The Fund has identified numerous instances where BCBSMA has paid claims in violation of the Plan's written terms, which require adherence to negotiated rates and prohibit billed charges that exceed negotiated rates. BCBSMA, however, has steadfastly and self-servingly rejected these concerns and has refused to provide the Fund with material information to address these concerns. BCBSMA breached and continues to breach its fiduciary duties and its separate obligations under state law.

62.     As part of the Fund's regular audits of its contractors, the Fund hired ClaimInformatics, LLC ("ClaimInformatics"), a corporation that provides healthcare claim payment review services to discover and recover improper payments in healthcare claims. On July 24, 2018, the Fund hired ClaimInformatics to perform a payment integrity review of the Fund's claims as processed and paid by BCBSMA.

63.     ClaimInformatics was tasked with reviewing all benefit payments BCBSMA caused the Fund to make between 2016 to 2018, in order to evaluate BCBSMA's administration of the Plan and identify and/or recover any overpayments.

64.     After just the first stage of its review, ClaimInformatics identified 5,574 claims that had been paid in error and concluded that the Plan had overpaid providers by at least $1,402,687.57 as a result. ClaimInformatics also found that Plan participants and beneficiaries had been overcharged (through deductibles and coinsurance, for example) by at least $32,810.74.

65.     The Fund performed a due diligence check of ClaimInformatics' findings, admittedly based on the limited information BCBSMA would provide, and agreed with ClaimInformatics' conclusions.

66.     The Fund has also periodically discovered irregularities in BCBSMA's claims processing on its own.

67.     The following paragraphs are examples of BCBSMA's pattern of causing the Plan to make excessive in-network benefit payments and of improper use of Plan assets.

68.     **BCBSMA Charges Exceed Provider Bills.** ClaimInformatics identified a striking pattern of BCBSMA calculating covered charges in amounts higher than the amounts healthcare providers actually billed. In just one of many examples, a hospital billed $38,786 for a claim. BCBSMA then priced that claim at $120,614—three times the billed charge.

69.     **Readmission Policy Errors.** BCBSMA's inpatient readmission policy provides that if a patient is readmitted to a hospital within seven days of discharge and the readmission is for a related diagnosis, the cost of the second hospital stay will be included in the price of the initial admission.

70.     This policy is also consistent with the Plan's written terms, which specify that, "for successive hospital confinements to be considered separate admissions, they must be due to entirely unrelated causes or separated by an interval of six months or more, or you must have returned to active work for at least one full working day, for members only."

71.     In December 2020, the Fund found numerous claims in which BCBSMA incorrectly priced such events as two separate hospital admissions in direct violation of BCBSMA's policy. When the Fund brought this error to BCBSMA's attention, BCBSMA said it would not be able to re-price the claim and correct the error on the front end to avoid overpayment to the provider.

72.     BCBSMA also stated it would not immediately seek recovery on those payments. Instead, BCBSMA said it would catch the error months later during its scheduled internal audit.

73.     Previously, in 2019, BCBSMA incorrectly priced two claims in violation of its inpatient readmission policy. Rather than bridge the two hospital admissions into one, BCBSMA priced them as two distinct admissions: $21,494.95 for the first and $63,599.28 for the second. In July and August 2019, BCBSMA discovered this error during its provider audit, retracted the first admission, charged a 30% recovery fee of $6,381.21 on it, and retracted the second admission. BCBSMA then sent the Fund a bridged claim, which it priced as $63,599.28 for both admissions. On September 26, 2019, the Fund told BCBSMA that this fee was improperly collected because BCBSMA itself had caused the error. BCBSMA agreed, explaining it had adjusted the claim with an incorrect code that generated the recovery fee. Although BCBSMA stated "the Fund should be credited this fee" in 2019, it was not until after Plaintiffs filed suit in 2021 that BCBSMA finally issued the refund.

74.     **Observation Room Errors.** BCBSMA's observation room billing policy at all relevant times was to charge a one-day rate for observation room stays up to 24 hours and a two-day rate for stays longer than 24 hours, with an absolute cap at the two-day rate. The number of hours a patient spent in an observation room is included on the claim the provider submits to BCBSMA. ClaimInformatics found numerous observation room stays that were shorter than 24

hours long, but that were erroneously paid as two-day stays under the two-day rate. Thus, these payments exceeded the amount permitted and owed under the Plan, in which the benefits are limited to the rates negotiated by BCBSMA.

75. BCBSMA caused this error, and thereby violated the Plan terms and caused erroneous benefit payments, by using the date span rather than the actual hours of the observation room stay. For example, a patient who was in an observation room from 10 PM one night until 1 AM the following day would have been in the observation room for just three hours. But in situations like this, BCBSMA regularly calculated the rate based on the two-day date span rather than the complete timeline of hours and priced stays shorter than 24 hours as two-day visits in contravention of its own policy.

76. Rather than paying the Fund back the entire amount that BCBSMA had expended in Plan assets due to BCBSMA's own error as it was required to do, it disclaimed any responsibility to cover the overpayments and pursued partial recoveries with hospitals. Between September 2017 and September 2018, BCBSMA reimbursed the Fund a total of $124,000 overpaid due to this error. But this was just the tip of the iceberg. After reviewing each claim and contacting hospitals directly, ClaimInformatics found that the Fund had overpaid an additional $505,612 due to BCBSMA's incorrect pricing of observation room stays. BCBSMA refuses to credit the Fund for the remaining $505,612. This means that BCBSMA has reimbursed the Fund for just under 20% of the Plan assets that were overpaid due solely to BCBSMA's error, and that 80% of the overpayment remains unaccounted for.

77. On information and belief, BCBSMA reached private settlements with these hospitals on this issue without the Fund's input or consent, and then used those funds to compensate for a small portion of the Fund's losses. The settlements grossly undercompensate

the Fund for errors that BCBSMA introduced into its pricing process, leading to overpaid benefit claims under the Plan. Significantly, regardless of whether BCBSMA was able to recover any of the overpayments from the hospitals, it owed the Fund the entire amount, since the overpayment was a direct result of BCBSMA's own error in using the wrong category of claims data and failing to apply its own payment policy. Moreover, it was administratively practical or reasonable to reprocess the impacted claims. All that was required was for BCBSMA to input different claim information (timespan instead of date span) into its claims processing system.

78. **Severity of Illness ("SOI").** Hospitals use SOI codes—levels 1, 2, 3, and 4 (minor, moderate, major, and extreme)—to identify how sick a patient is and what burden of illness the patient presents. For example, someone with an SOI of 1 is asymptomatic, requires only noninvasive diagnostic or minor therapeutic procedures, and responds promptly to treatment; whereas a person with a level 4 SOI has catastrophic manifestations of illness, requires emergency life support, and has no response to treatment. The rates BCBSMA negotiates with hospitals call for higher healthcare costs with higher SOIs. Thus, the benefits the Fund owes for a patient with a level 4 SOI will be higher than the benefits owed for that same procedure for a patient with a level 3 SOI or below. In making the benefit determination under the Plan, however, BCBSMA processes and accepts an excessive and statistically improbable number of claims with level 4 (the highest) SOI adjustments. Thus, on information and belief, BCBSMA has frequently overpaid Plan assets by paying hospitals more than they are entitled to under their negotiated rates, thereby violating BCBSMA's obligation to comply with Plan terms (i.e., to limit benefit payments to no more than the negotiated rates).

79. **Inconsistent Claims.** BCBSMA processed without question a benefit claim under the Plan that was billed as two distinct healthcare services: the hospital billed it as a foot

amputation and the doctor billed it as a toe amputation. It did so despite the fact that it had received clear red flags suggesting that the hospital had incorrectly overbilled for an amputation, leading to excess payments of Plan assets. When questioned by Plaintiffs, BCBSMA refused to provide back-up documentation to support how it processed the claim and made the benefit determination.

80.    **Post-Pay Audit Policies.** In May 2021, the Fund challenged BCBSMA's decision to process a claim after accepting without question a provider's bill charging three hours for a procedure known to take just one-to-five minutes. This indicates that the Plan terms were, in all likelihood, violated by BCBSMA when it issued a benefit payment from Plan assets that far exceeded the proper negotiated rate for the actual service provided. BCBSMA's response was that it would flag the issue but that the auditing policy for claims like this (specifically "all same day surgery with observation claims") was to review them only "on a post pay basis." Thus, regardless of how implausible any such claim data appears, once BCBSMA has priced the claim, it has a stated policy against reviewing it for error until the money has been paid to the provider. History suggests that BCBSMA will subsequently collect an undeserved recovery fee when it finally conducts a post-pay audit.

81.    **Unauthorized Recovery Fees.** In one instance, a hospital rebilled a claim— essentially retracting the original bill and issuing a revised one. This did not result in any credit or refund, so there was no overpayment. Not only was there nothing to recover, but also the rebilling was entirely handled by the hospital, meaning BCBSMA conducted no recovery process at all. Nevertheless, BCBSMA wrongly processed this as a recovery of $21,270.71 (the amount originally billed) and paid itself $6,381.21 of Plan assets as a result. In another instance, BCBSMA corrected a claim originally priced at $20,998.90, which resulted in a partial recovery

of $4,518.40. Although the recovery fee should have been assessed on only the $4,518.40 recovered, BCBSMA wrongly charged a 30% fee on the entirety of the $20,998.90 claim. BCBSMA therefore paid itself a severely inflated fee of $6,299.67 out of Plan assets when 30% of the amount recovered was just $1,355.52. Furthermore, there are numerous instances of BCBSMA causing an error itself, catching it, fixing it, and collecting a recovery fee from Plan assets to which it was not entitled.

82.     **Coding Advisor Program Fee.** In March 2021, the Fund discovered that in October 2020, BCBSMA began to charge a quarterly 19% commission fee on savings to the Fund from BCBSMA's audits of out-of-network claims that had been processed under the Plan. BCBSMA had never notified the Fund about this new Coding Advisor Fee and the Fund never consented to it. Further, many of the affected claims were not out-of-network and therefore not subject to the Coding Advisor Program Fee as defined by BCBSMA. In June 2021, BCBSMA admitted that the Fund had never signed the 2019 ASA amendment containing the Coding Advisor Program, even though it continues to bill the Fund for the fee and has asked the Fund to sign a contract that is backdated to when the fee first started being improperly charged.

83.     On information and belief, BCBSMA's misconduct springs from the fact that it prioritizes its own interests and its relationships with network providers above the interests of individual plans it administers, such as the Plan. This self-interest causes BCBSMA to disregard the written terms of a given ERISA plan, as alleged herein, and its other fiduciary duties, as alleged herein. Indeed, BCBSMA admits that it operates "on behalf of its entire book of business" rather than for the exclusive purposes defined by 29 U.S.C. § 1104(a)(1)(A). *See* Dkt. No. 12 at 8.

**BCBSMA Blocks the Fund from Recovering Benefit**
**Payments in Excess of the Plan's Written Terms**

84.     BCBSMA is obligated as a Plan administrator and fiduciary to accurately determine benefit amounts and regularly review past benefit payments for errors or fraud and to pursue payment recovery on them. But the insufficiency of BCBSMA's recovery efforts is revealed by the fact that across roughly $245 million of claims data, less than 1% of it is recovered. This is notwithstanding the fact that it is generally recognized in the industry that somewhere between 50% and 80% of medical billings contain errors. Moreover, BCBSMA does not conduct recovery efforts on an ongoing basis. BCBSMA's overpayment and recovery process timeline serves BCBSMA's own financial interests rather than the Fund's entitlement to regularly credits for overpaid claims.

85.     Based on BCBSMA's failure to recover overpayments, the Fund authorized ClaimInformatics to pursue recovery of the $1.4M in overpayments ClaimInformatics identified in its first stage of review. It did so in recognition of the fact that these were overpayments of Plan assets, and in the exercise of the Fund's fiduciary duties to the Plan and its members.

86.     In March 2019, ClaimInformatics and the Fund sent letters to each provider believed to have been overpaid, notifying the provider of the overpayment, giving the basis for the belief of overpayment, and providing an opportunity to appeal.

87.     By April 2019, ClaimInformatics was in direct communication with a majority of these providers and had started receiving refund checks from providers who agreed that the Fund had overpaid them. Within the first thirty days of recovery, ClaimInformatics collected $77,337.83 from providers. To date, ClaimInformatics has collected $204,772 in refund checks.

88.     On April 2, 2019, however, BCBSMA demanded that the Fund cease its recovery efforts. Christopher May, the Fund's account representative at BCBSMA, told the Fund to

immediately stop communicating with providers, claiming that such communications were "not allowed" under the ASA, even though the ASA contains no such prohibition.

89.     While the Fund did not agree with BCBSMA that the effort to collect the overpayments was improper, the Fund nevertheless complied with BCBSMA's demand in an effort to avoid creating a conflict and to protect its members. At the direction of the Fund, ClaimInformatics immediately ceased direct communications with providers. The Fund feared that conflict with BCBSMA would threaten the business relationship and consequently endanger Plan members' continuity of healthcare with BCBSMA network providers. But by ceasing overpayment communications with network providers, the remainder of the overpayments the Fund and ClaimInformatics identified in the first stage of review could not be recovered.

90.     Around this time, BCBSMA contacted all of its network providers and instructed them to ignore any notices of overpayments sent by the Fund. Some providers reached out to ClaimInformatics and shared that BCBSMA had advised them not to send any refund checks to the Fund, even though those providers agreed that they had received overpayments. Notably, BCBSMA never followed up on these identified overpayments to ensure that they would be returned to the Fund.

91.     On April 24, 2019, Brian Fox, Assistant General Counsel of BCBSMA, wrote a letter reiterating that the Fund should not contact any providers directly.

92.     BCBSMA's complete blockade of Fund communication with network providers prohibits the Fund from one of the two sources of information about whether the BCBSMA's claims processing complies with Plan terms. The only other source is, of course, BCBSMA. But BCBSMA conceals all such information.

**BCBSMA Rejects ClaimInformatics' Findings and Stonewalls**
**Attempts to Corroborate That It Correctly Processed All Claims**

93.     ClaimInformatics continued to comb through the claims BCBSMA processed for the Fund and identified numerous irregularities. Throughout this process, the Fund regularly notified BCBSMA of ClaimInformatics' findings and concerns in hopes that BCBSMA would work with the Fund and ClaimInformatics to find common ground and resolve the errors.

94.     To help with this process, ClaimInformatics gave BCBSMA a detailed file containing a sample of 233 of the 5,574 claims that comprised the $1.4M in identified overpayments. ClaimInformatics narrowed these claims down even further into 80 sample claims that represented the key pricing issues discovered. One area of concern involved the SOI adjustments discussed above.

95.     In its review, ClaimInformatics noticed an unusual number of claims with level 4 (the highest) SOI adjustments. ClaimInformatics suspected that some hospitals were improperly upcoding—or inflating the cost of the healthcare services by baselessly classifying patients at higher SOIs. ClaimInformatics believed that it could determine whether the hospitals were engaged in impropriety by auditing the suspect bills and reviewing the medical records to confirm whether the patients were classified under the correct SOIs. ClaimInformatics and the Fund asked BCBSMA to provide them with the necessary information. BCBSMA refused.

96.     Later, BCBSMA asserted—without providing any proof or back-up documentation—that it had audited the claims and that all the SOIs were correct. ClaimInformatics and the Fund asked to see the audit records and medical records to verify BCBSMA's findings. BCBSMA refused to provide these records. In some cases, BCBSMA said they did not exist.

97.     ClaimInformatics' concern that hospitals had upcoded SOIs was warranted. A recent report by the Office of the Inspector General of the U.S. Department of Health and Human Services (the "Department") concluded that "[s]tays at the highest severity level are vulnerable to inappropriate billing practices, such as upcoding-the practice of billing at a level that is higher than warranted." "Trend Toward More Expensive Hospital Stays in Medicare Emerged Before COVID-19 and Warrants Further Scrutiny," Office of Inspector General, U.S. Dep't of Health & Human Servs. (Feb. 19, 2021), https://www.oig.hhs.gov/oei/reports/OEI-02-18-00380.asp.

98.     Had BCBSMA properly exercised its obligations to the Fund, it would have identified these problems in advance, so as to avoid overpayments being made with Plan assets. BCBSMA is duty-bound to put systems in place to monitor and thwart provider fraud. But BCBSMA has fallen far short of this obligation and blocked attempts to review even the most obviously incorrect claims, thereby allowing such errors to remain hidden.

99.     One such claim, identified above, was billed by the hospital as a foot amputation and by the doctor as a toe amputation. ClaimInformatics asked BCBSMA to audit this claim since one of the charges was necessarily incorrect. BCBSMA later asserted that it conducted an audit, which purportedly revealed that the doctor erred and that the amputation was of the foot. Based on its experience in the field, ClaimInformatics doubted that the doctor had made such a glaring error and billed a less complex procedure than actually performed. Indeed, logic and experience suggest it far more likely that the hospital had upcoded the charge in order to bill more, not that the doctor had downcoded such that the payment would be far less. ClaimInformatics accordingly requested to review the audit report and medical records on behalf of the Fund in order to verify BCBSMA's finding. Once again, BCBSMA refused to provide any documentation and therefore blocked the Fund from verifying a blatant claim error.

100.     Throughout the parties' communications, the Fund and ClaimInformatics made clear that they would be unable to validate BCBSMA's findings without the necessary documentation, including BCBSMA's individual contracts with network providers, the newly concealed payment policies, audit reports, and medical records.

101.     Throughout these discussions, BCBSMA steadfastly maintained that ClaimInformatics' findings were wrong. BCBSMA repeatedly asserted that it had processed claims correctly in accordance with confidential contracts with in-network providers. Based on BCBSMA's representations, each of these provider contracts sets forth a rate schedule particular to that provider and distinct from BCBSMA's operative billing policies. But despite the importance of these provider contracts for setting the Covered Expenses under the Plan, and the applicable billing policies BCBSMA applied in interpreting the contracts to establish the amount of benefits to be paid by the Fund, and notwithstanding the Fund's repeated requests to see them, BCBSMA refused to let the Fund review this information to confirm that BCBSMA had not caused claim overpayments.

102.     BCBSMA also repeatedly brushed aside other concerns by claiming—without any proof or opportunity for the Fund to verify BCBSMA's assertions—that it had conducted audits that showed that BCBSMA did not err and that no payment recovery would be necessary. Despite the clear answers supposedly uncovered in BCBSMA's audits, BCBSMA refused to show the Fund the audit records or related medical records to verify BCBSMA's findings.

## COUNT ONE
### (Breach of Fiduciary Duty, 29 U.S.C. § 1132(a)(2))

103.     Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

104.    At all times relevant, and with specific respect to the actions described above, BCBSMA was an ERISA fiduciary. As such, it owed duties of loyalty, care, prudence, and candor. It also held a duty to act in accordance with the documents and instruments governing the Plan.

105.    BCBSMA breached its fiduciary duties under ERISA by consistently violating Plan terms and using Plan assets to overpay benefits, while taking excessive fees and concealing relevant information, and using its considerable discretionary authority to advance interests other than those of the Plan or its members.

106.    These breaches, in turn, harmed the Plan and its members as alleged herein, including by: causing them to pay more than the Plan's terms required; frustrating their ability to discover and recover Plan overpayments; increasing administrative time and expense by requiring Plaintiffs to spend time and resources addressing BCBSMA's malfeasance; and diminishing Plan assets.

107.    BCBSMA violated these duties by engaging in the actions described herein, and is therefore liable for its breaches under 29 U.S.C. § 1109.

### **COUNT TWO**
**(Engaging in Prohibited Transactions, 29 U.S.C. § 1132(a)(2))**

108.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

109.    At all times relevant, and with specific respect to the actions described above, BCBSMA was an ERISA fiduciary. Therefore, under 29 U.S.C. § 1106(b)(1), BCBSMA was prohibited from dealing with the assets of the Plan in its own interest or for its own account. As described above, BCBSMA dealt with Plan assets in its own interest and for its own account

through methods including but not limited to its collection of unauthorized fees and engagement in settlement agreements with network providers.

### COUNT THREE
**(29 U.S.C. § 1132(a)(3))**

110.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

111.    29 U.S.C. § 1132(a)(3)(A) provides injunctive relief for *any* act or practice that violates ERISA or the terms of the Plan. 29 U.S.C. § 1132(a)(3)(B) allows for other appropriate equitable relief to address violations of ERISA and the Plan, or to enforce any provisions of either.

112.    As detailed above, at all times relevant, BCBSMA was a fiduciary of the Plan, owed fiduciary duties, and breached those duties. Through these breaches, BCBSMA violated ERISA, which entitles Plaintiffs to relief under 29 U.S.C. § 1132(a)(3).

113.    Indeed, regardless of whether BCBSMA was a fiduciary, Plaintiffs are entitled to relief under 29 U.S.C. § 1132(a)(3) because BCBSMA violated Plan terms and misused Plan assets as described above.

### COUNT FOUR
**(Accounting)**

114.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

115.    Plaintiffs bring this Count to the extent that Counts One, Two, and Three under ERISA do not provide complete relief for the misconduct alleged herein.

116.    As described above, BCBSMA is obligated to perform a number of managerial and discretionary responsibilities with respect to the Plan. It must act in accordance with the

documents and instruments governing the Plan and provide an accounting to the Fund upon request.

117.    BCBSMA has repeatedly refused the Fund's requests for the documents and instruments that BCBSMA has indicated govern the Plan and any financial information regarding the administration and management of the Plan and its assets.

118.    BCBSMA's refusal to provide the Fund with this documentation, information, and an accounting of processed claims has harmed the Plan and its members by concealing the extent of BCBSMA's misconduct and mismanagement and by preventing the Fund from recovering overpaid amounts. Furthermore, BCBSMA has inflated the cost of healthcare, requiring union members' employers to contribute more towards health benefits and thus withhold more money from union members' paychecks.

**COUNT FIVE**
**(Breach of Contract)**

119.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

120.    Plaintiffs bring this Count to the extent that Counts One, Two, and Three under ERISA do not provide complete relief for the misconduct alleged herein.

121.    The Fund and BCBSMA are parties to the ASA.

122.    The ASA is a valid, legal, binding, and enforceable contract entered into for consideration. The ASA incorporates the SPD.

123.    Plaintiffs fully complied with their obligations under the ASA.

124.    As described above, BCBSMA acted in breach of express terms of the ASA through conduct including but not limited to collecting unauthorized fees, overpaying network

providers, and failing to reimburse Plan assets for amounts BCBSMA overpaid providers due to its own errors.

125.    As a result, the Fund suffered a significant loss of Plan assets in addition to the fees the Fund paid BCBSMA for unperformed services.

## COUNT SIX
### (Breach of the Covenant of
### Good Faith and Fair Dealing)

126.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

127.    Plaintiffs bring this Count to the extent that Counts One, Two, and Three under ERISA do not provide complete relief for the misconduct alleged herein.

128.    The Fund and BCBSMA are parties to the ASA.

129.    The ASA is a valid, legal, binding, and enforceable contract entered into for consideration. The ASA incorporates the SPD.

130.    A covenant of good faith and fair dealing is implied in all contracts in Massachusetts.

131.    The implied covenant prevents a party from doing anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.

132.    The Fund reasonably understood the ASA to permit either BCBSMA or the Fund to pursue claim recovery for erroneous payments.

133.    The Fund reasonably understood the ASA to include implied promises that neither it nor BCBSMA would obstruct the other's efforts to pursue payment recovery.

134.    The Fund reasonably understood the ASA to establish an agency relationship in which the Fund is the principal and BCBSMA is the agent in pricing claims, directing Plan assets, and pursuing payment recovery.

135.    The Fund reasonably understood the ASA to include implied promises that BCBSMA would share with the Fund all foundational information governing BCBSMA's discharge of its duties under the contract.

136.    As detailed above, BCBSMA acted in bad faith through conduct including but not limited to concealing and withholding material documents and information; obstructing Plaintiffs' recovery efforts; collecting recovery fees in unauthorized situations; and collecting excess fees beyond what is permitted under the ASA.

137.    As a result, the Fund incurred damages in the amount of all overpaid claims that BCBSMA prohibits the Fund from meaningfully identifying and/or recovering.

## COUNT SEVEN
### (Unfair and Deceptive Business Practices, Mass. G.L. 93A § 9)

138.    Plaintiffs incorporate by reference the preceding paragraphs as though such paragraphs were fully stated herein.

139.    Plaintiffs bring this Count to the extent that Counts One, Two, and Three under ERISA do not provide complete relief for the misconduct alleged herein.

140.    This claim is brought under Mass. G.L. 93A § 9.

141.    BCBSMA committed unfair and deceptive business acts and practices through the conduct detailed above, including but not limited to overpaying network providers; concealing and withholding material documents and information; obstructing Plaintiffs' recovery efforts; unilaterally amending the ASA; collecting and refusing to return unauthorized recovery fees; and entering into improper settlement agreements with network providers.

32

142.    On January 15, 2020, Plaintiffs, through their counsel, delivered to BCBSMA a written demand for relief that set forth the unfair and deceptive business acts and practices committed by BCBSMA against Plaintiffs. BCBSMA refuses to provide the relief requested in that letter.

143.    BCBSMA's unfair and deceptive business acts and practices have injured Plaintiffs by (1) depleting Plan assets by causing the Fund to overpay claims; (2) frustrating their ability to discover and recover Plan overpayments; and (3) increasing the Plan's administrative costs by requiring them to spend time and resources addressing BCBSMA's malfeasance.

144.    BCBSMA's unfair and deceptive business acts and practices are the direct cause of Plaintiffs' injuries for reasons including but not limited to the following: (1) the relationship between the parties required Plaintiffs to blindly rely on BCBSMA's pricing of claims and make payments in accordance with BCBSMA's pricing; (2) BCBSMA instructed network providers to cease communication with the Fund regarding overpayment recoveries and the providers complied; and (3) BCBSMA's gatekeeping of crucial and foundational documents is the only barrier preventing Plaintiffs from identifying the extent of BCBSMA's misdirection of Plan assets and recovering those unidentified overpayments.

## JURY DEMAND

145.    Counts One, Two, and Three above are brought under ERISA, for which Plaintiffs are submitting their claims to the Court for final adjudication in a Bench Trial. For Counts Four through Seven, Plaintiffs hereby demand a Jury Trial for determination of BCBSMA's liability and appropriate remedies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands the following relief:

(i)      An order requiring BCBSMA to repay all overpayments it caused to be made and to make good to the Fund all other losses resulting from BCBSMA's breaches of fiduciary duty, plus interest;

(ii)     Injunctive relief to require BCBSMA to fulfill its duties as a designated administrator by processing claims without violating the Plan, including to enjoin BCBSMA from settling eligible expenses in an amount that exceeds the negotiated rates of network providers;

(iii)    An order requiring BCBSMA to provide access to BCBSMA's provider contracts and other back-up documentation relating to how BCBSMA has processed Plan claims;

(iv)    A declaration that the Fund is entitled to independently pursue claim payment recovery;

(v)     Damages and interest thereon for state law claims in an amount to be determined at trial;

(vi)    Punitive damages for state law claims in an amount to be determined at trial;

(vii)   An accounting of paid claims;

(viii)  Reasonable attorneys' fees and costs plus pre- and post-judgment interest in accordance with the foregoing; and

(iv)    Such other and further relief as the Court deems just and proper.


Dated: June 28, 2021                       Respectfully submitted,

                                      ZUCKERMAN SPAEDER LLP

                                      By: /s/ D. Brian Hufford

                                      D. Brian Hufford, Esq.
                                      (*pro hac vice*)
                                      Jason Cowart, Esq.
                                      (*pro hac vice*)
                                      Leila Bijan, Esq.
                                      (*pro hac vice*)
                                      485 Madison Avenue, 10th Floor
                                      New York, NY 10022
                                      Tel: 212.704.9600
                                      Fax: 212.704.4256
                                      dbhufford@zuckerman.com

jcowart@zuckerman.com
lbijan@zuckerman.com

O'REILLY, GROSSO, GROSS & JONES,
P.C.
James F. Gross, Esq.
1661 Worcester Road, Suite 403
Framingham, MA 01701
Tel: 508.620.0055
jgrosso@ogglaw.com

*Counsel for Massachusetts Laborers' Health
and Welfare Fund, Trustees of
Massachusetts Laborers' Health and
Welfare Fund*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on June 28, 2021.

/s/ D. Brian Hufford
D. Brian Hufford