**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND, and TRUSTEES OF THE MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND, as Fiduciaries,**<br><br>        **Plaintiffs,**<br><br>    **v.**<br><br>**BLUE CROSS BLUE SHIELD OF MASSACHUSETTS,**<br><br>        **Defendant.** | **Civil Action No. 1:21-cv-10523** |

**REPLY IN SUPPORT OF DEFENDANT
BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, INC.'S
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
(LEAVE TO FILE GRANTED ON SEPTEMBER 8, 2021)**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

I.   BCBSMA Lacks Discretionary Authority over the Plan............................................. 4

II.  BCBSMA Does Not Have Control or Authority over The Disposition
     or Management of Plan Assets............................................................................... 10

III. BCBSMA Is Not a Named Fiduciary ....................................................................... 13

IV.  The Fund's Third Count Fails Because BCBSMA Is Not a Fiduciary ...................... 14

V.   The Court Should Not Exercise Supplemental Jurisdiction .................................... 15

CONCLUSION........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baker v. Big Star Div. of the Grand Union Co.*,
   893 F.2d 288 (11th Cir. 1989) ................................................................................................3, 5

*Charters v. John Hancock Life Ins. Co.*,
   583 F. Supp. 2d 189 (D. Mass. 2008) ............................................................................................9

*DeLuca v. Blue Cross Blue Shield of Mich.*,
   628 F.3d 743 (6th Cir. 2010) ..........................................................................................................3, 11

*Doe 1 v. Express Scripts, Inc.*,
   837 F. App'x 44 (2d Cir. 2020) ....................................................................................................11

*Golden Star, Inc. v. Mass Mut. Life Ins. Co.*,
   22 F. Supp. 3d 72 (D. Mass. 2014) ...............................................................................................9

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
   530 U.S. 238 (2000).........................................................................................................................15

*ILWU-PMA Welfare Plan Bd. of Trs. v. Conn. Gen. Life Ins. Co.*,
   No. 15-cv-02965, 2015 WL 9300519 (N.D. Cal. Dec. 22, 2015)..............................................9

*In re Express Scripts/Anthem ERISA Litig.*,
   285 F. Supp. 3d 655 (S.D.N.Y. 2018)..........................................................................................5

*In re Fid. ERISA Float Litig.*,
   829 F.3d 55 (1st Cir. 2016)......................................................................................................10, 11

*In re Out-of-Network Substance Use Disorder Claims Against UnitedHealthcare*,
   No. 19-cv-2075, 2021 U.S. Dist. LEXIS 74098 (C.D. Cal. Apr. 14, 2021) ............................12

*IT Corp. v. Gen. Am. Life Ins. Co.*,
   107 F.3d 1415 (9th Cir. 1997) ...............................................................................................1, 5, 8

*LD v. United Behav. Health*,
   508 F. Supp. 3d 583 (N.D. Cal. 2020) ........................................................................................15

*Livick v. The Gillette Co.*,
   524 F.3d 24 (1st Cir. 2008).............................................................................................................11

*Monterey Peninsula Horticulture, Inc. v. Emp. Benefit Mgmt. Servs., Inc.*,
   No. 20-cv-01660, 2020 WL 2747846 (N.D. Cal. May 27, 2020)............................................12

*Nat'l Foreign Trade Council v. Natsios*,
   181 F.3d 38 (1st Cir. 1999)............................................................................................................15

*Pegram v. Herdrich*,
   530 U.S. 211 (2000)........................................................................................................................14

*Pharm. Care Mgmt. Ass'n v. Rowe*,
   429 F.3d 294 (1st Cir. 2005)...........................................................................................................6

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Reich v. Rowe*,
   20 F.3d 25 (1st Cir. 1994) ...........................................................................................15

*RJ v. Cigna Behav. Health, Inc.*,
   No. 20-cv-02255, 2021 WL 1110261 (N.D. Cal. Mar. 23, 2021) ...........................12

*Santana v. Deluxe Corp.*,
   920 F. Supp. 249 (D. Mass. 1996) ...............................................................................5, 6

*TML Recovery, LLC v. Cigna Corp.*,
   No. 20-cv-00269, 2021 WL 3730168 (C.D. Cal. July 26, 2021)............................12

*Toomey v. Jones*,
   855 F. Supp. 19 (D. Mass. 1994) ................................................................................5

*United Mine Workers of Am. v. Gibbs*,
   383 U.S. 715 (1966) .......................................................................................................15

*W.E. Aubuchon Co. v. BeneFirst, LLC*,
   661 F. Supp. 2d 37 (D. Mass. 2009) ......................................................... *passim*

### STATUTES

29 U.S.C. § 1002 .................................................................................................................1, 11

29 U.S.C. § 1102 .................................................................................................................13, 14

29 U.S.C. § 1132 .................................................................................................................4, 14, 15

### OTHER AUTHORITIES

29 C.F.R. § 2509.75-8 ......................................................................................................5

## INTRODUCTION

This dispute has little to do with ERISA, a fact Plaintiffs Massachusetts Laborers' Health and Welfare Fund and its Trustees (collectively, the "Fund") confirm in their opposition. The Fund admits that BCBSMA's negotiation of discounted healthcare provider prices is non-fiduciary. Opp. 2. The Fund also admits that BCBSMA does not decide whether to grant or deny benefits, or what portion of the cost of a claim is to be covered by the Fund. *Id.* at 19; FAC ¶ 48. Accordingly, the Fund's argument is limited to the notion that BCBSMA has made errors in *repricing* claims—that is, alleged errors in assigning to a particular claim a particular price BCBSMA has already negotiated with the provider. As this Court—and numerous others—has held, repricing claims is not a fiduciary activity, and to rule as much would be a seismic shift in ERISA law.

First, repricing claims is not "discretionary authority" over a plan. 29 U.S.C. § 1002(21)(A). The Fund's sole argument on this point is that, because the plan limits "covered expenses" to the "negotiated rate," and BCBSMA applies its negotiated rate when repricing a claim, BCBSMA somehow "[i]nterprets" *the plan's terms* when it does so. Opp. 9. But there is no dispute over the interpretation or meaning of that plan provision. Indeed, the Fund itself asserts that BCBSMA *has no discretion* to interpret that phrase—BCBSMA is contractually required to apply the negotiated rate, period. *Id.* at 4-5. Moreover, applying the negotiated rate to a claim and then handing that information to the Fund is the *definition* of a ministerial task. It does not become "discretionary" simply because the Fund alleges that BCBSMA erred in doing so. It is precisely this sort of "power to err, as when a clerical employee types an erroneous code onto a computer screen," that does *not* involve fiduciary duties. *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997).

Second, BCBSMA does not control the "management or disposition" of plan assets. 29 U.S.C. § 1002(21)(A). The Fund still does not identify any misused assets in which it has a

1

beneficial interest. Instead, the Fund doubles down on its theory that BCBSMA controls plan assets because, when BCBSMA reprices a claim, that ultimately affects how much the Fund will pay. Opp. 15. But as BCBSMA already explained, merely *affecting* plan assets does not make one a fiduciary. If "impact[ing] Plan assets" were sufficient to impose fiduciary duties, *id.*, *everyone* that contracts with an ERISA-regulated benefit plan would be a fiduciary. All service providers "affect" plan assets: if their service is *poor*, the plan's assets are affected, if their service is accidentally *overpriced*, they have affected plan assets, and so forth. Under the Fund's theory, if a hospital charges a plan for a service, it, too, "controls" plan assets. Make no mistake: the Fund's theories would dramatically expand the scope of ERISA fiduciary liability.

Yet there is no reason to stretch ERISA well past its breaking point. Contrary to the Fund's assertion, it would not be left in "no-man's land" if its federal claims were dismissed, *id.* at 22 n.8. It has a *contract* with BCBSMA regulated by state law. But it has mystifyingly chosen to seek admission to federal court through an unsupportable ERISA claim rather than take the appropriate contract and state-law afforded measures to resolve its dispute. For instance, the Fund protests that it cannot adequately review BCBSMA's pricing calculations, but the parties' Administrative Services Account Agreement ("ASA") gives the Fund the right to audit those decisions—a contract right it *has not used*. ASA at 15. Likewise, if BCBSMA somehow violated the contract by mispricing claims, the Fund can (as it has done) file suit for breach. BCBSMA believes the Fund's state law claims are unsupported, but the Fund is hardly without legal recourse for its garden-variety state-law dispute. The Fund's claims should be dismissed.

## ARGUMENT

The Fund's opposition has narrowed this dispute to one discrete activity: the application of BCBSMA's negotiated prices to given claims (i.e., repricing claims). That being the case, it is worth reviewing the claims process to emphasize just how ministerial a duty that is.

BCBSMA maintains a network of health care providers with whom it negotiates discounted healthcare prices. ASA at 5, 7; Mem. of Law in Supp. of Mot. to Dismiss Pls. Amend. Compl., ECF Doc. 16-1 ("MTD") at 5-6. Through the ASA, the Fund "'rent[s]'" that network, *Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1989), as BCBSMA agrees to make it "available to Participants in the Plan," ASA at 6-7. The Fund admits that BCBSMA's maintenance of this network and negotiation of rates with providers is *not* fiduciary, Opp. 2, and with good reason. As noted in *DeLuca v. Blue Cross Blue Shield of Michigan*, 628 F.3d 743, 747 (6th Cir. 2010), third-party administrators like BCBSMA maintain a provider network and negotiate rates across their entire book of business—it is not a fiduciary act done at a plan's behest.

When a participant makes a claim, BCBSMA reprices the claim "in accordance with" the rates it has already negotiated for its entire network. ASA at 5. In other words, BCBSMA does no more than replace the provider's standard price with the *negotiated* price. So if the hospital would normally charge $10,000 for the service, but BCBSMA has negotiated a $5,000 price, BCBSMA provides that pricing information to the Fund.

The Fund then determines *everything else*. The Fund "determine[s] member eligibility, the availability of benefits and claims adjudication." *Id*. at 4. In other words, the Fund determines whether the claimant is eligible (i.e., is she covered by the plan at all) and whether the procedure is covered (i.e., does the plan cover this particular physical therapy). The Fund also determines "copayment, deductible, and coinsurance exclusions," FAC ¶ 48, meaning that the Fund determines not only who and what is covered, but also *how much* of the price will be covered. It then forwards "final approval or denial" to BCBSMA, which only then "remit[s] the appropriate claim payment to the network provider." ASA at 5.

Nevertheless, the Fund asserts that BCBSMA's application of its negotiated rates to given

claims is somehow a fiduciary duty. That is wrong. *First*, the Fund does not identify the "discretion" that BCBSMA supposedly has. The very notion is risible: the Fund admits that the negotiation of rates with providers (the part that involves discretion, judgment, and authority) is *not* fiduciary but then tries to assert that the *application* of those preexisting rates (the part requiring nothing but clerical calculations) *is* fiduciary. *Second*, the Fund's argument as to plan assets is wrong; BCBSMA does not "control" the "management or disposition" of plan assets merely because it provides the priced claim to the Fund. Even assuming that BCBSMA's arithmetical tasks "impact" the Fund's assets, Opp. 15, that is insufficient, as a matter of law, to transform BCBSMA into an ERISA asset manager.

The Fund's remaining arguments are makeweights: (1) BCBSMA is quite literally *not* named as a fiduciary in the plan; (2) the Fund cannot succeed on a claim under 29 U.S.C. § 1132(a)(3) unless BCBSMA is a fiduciary; and (3) if the Court dismisses the federal claims, there is no reason to exercise supplemental jurisdiction over the Fund's state law claims.

## I. BCBSMA LACKS DISCRETIONARY AUTHORITY OVER THE PLAN.

The Fund asserts that BCBSMA "interpret[s]" the plan's so-called "Negotiated Rate Mandate," and thus has "discretionary authority" over the plan. Opp. 10-11. But the Fund still does not explain *how* BCBSMA "interprets" this provision. In fact, the Fund itself makes clear that there is nothing to interpret. Under the ASA (and the "Negotiated Rate Mandate"), the maximum price for a service is BCBSMA's already-negotiated price. ASA at 5 (BCBSMA must "reprice" all claims "in accordance with [BCBSMA]'s provider reimbursement arrangements"). The Fund alleges that, sometimes, BCBSMA applies the wrong number. Maybe so, but that error has nothing to do with "interpretation" or "administration" of the *plan*. The Fund's own argument that BCBSMA *must* "comply with the Negotiated Rate Mandate" reinforces the point. Opp. 10. Indeed, were the Court to allow this litigation to move forward, the dispute would be whether BCBSMA

correctly applied the rates required by its contracts with providers—not about the meaning of the so-called "Negotiated Rate Mandate" under the plan. And applying a negotiated rate to a given claim is as "ministerial" as it comes. 29 C.F.R. § 2509.75-8, D-2; MTD 12-14.[1]

The Fund nevertheless argues that BCBSMA's application of these rates is discretionary administration because it is not performed within a "framework … made by others." Opp. 11 (citation omitted). But the Fund upends its own argument by conceding that the plan and the ASA *require* BCBSMA to reprice claims using its negotiated rates. *E.g.*, *id.* at 4-5, 15. Thus, the "framework" is indeed "made by others": the Fund. Any mistake in application of the Fund-required negotiated rates would be a paradigmatic case of a non-discretionary error, "as when a clerical employee types an erroneous code onto a computer screen." *IT Corp.*, 107 F.3d at 1421.

BCBSMA's various cases confirm this point, and the Fund does little to argue otherwise. The Fund asserts, for instance, that the third-party administrators in *Santana v. Deluxe Corp*., 920 F. Supp. 249 (D. Mass. 1996), *Baker*, 893 F.3d 288, *In re Express Scripts/Anthem ERISA Litigation*, 285 F. Supp. 3d 655 (S.D.N.Y. 2018), and *Toomey v. Jones*, 855 F. Supp. 19 (D. Mass. 1994), were "merely following a framework of payment rules," not "exercising discretion." Opp. 19. To start, that is exactly the situation here: the ASA requires BCBSMA to apply the negotiated rate when repricing claims. Moreover, the Fund ignores the actual facts of these cases, where the third-party administrators had *far* greater duties than mere repricing. In *Santana*, 920 F. Supp. at 254, for instance, the third-party administrator was

> charged with certifying that a charge is covered under the Plan; preparing a claim for processing; computing benefits; issuing benefits; furnishing employees with an explanation of benefits; recording accounting and statistical data; producing statistical reports; and coordinating benefits. In addition to performing the initial

---

[1] To be sure, BCBSMA has to identify billing codes and calculate prices pursuant to its own provider contracts and payment policies, *e.g.*, FAC ¶ 73, but that is not interpretation or administration of the *plan*.

> examination of a claim, and computing and issuing benefits, John Hancock's claim
> services also include preparing the various forms required in connection with
> claims processing, excluding a plan description; maintaining an accounting of
> payments to claimants; controlling claim abuses; accumulating and analyzing basic
> statistics; analyzing the Plan; and, after consulting with Deluxe, making
> recommendations with respect to changes or modifications of the Plan.

Yet the Court held that these functions were all "ministerial." *Id.* There can be no serious argument

that BCBSMA's application of unchallenged rates is somehow less "ministerial" than these.[2]

The Fund tries to circumvent this flaw by arguing that BCBSMA's internal calculations

are somehow "interpretation[]" of the plan, but that is plainly false. Opp. 11 (citation omitted). As

BCBSMA already explained (and the Fund ignores) applying the negotiated rate (however set)

does not "interpret" the plan any more than the Bureau of Labor Statistics "interprets" contracts

dependent on the Consumer Price Index. MTD 16. Plus, the Fund's argument is internally

inconsistent: it admits that BCBSMA's *negotiation* of rates is not fiduciary, Opp. 2, but somehow

*applying* those rates *is* fiduciary? That is akin to conceding that a financial advisor's picking of

stocks is not fiduciary conduct but then arguing that the same financial advisor acts with fiduciary

discretion when typing the selected stock trades into a software system.

The Fund also tries to distinguish its claims from the mine-run third-party administrator

cases on the basis that BCBSMA "shrouds" its methods in "total secrecy," so the Fund "cannot

override BCBSMA's calculations." *E.g.*, *id.* at 14, 16-17, 21. This is neither true nor relevant.

Under the ASA, BCBSMA granted the Fund the right to request an audit "to ensure that

[BCBSMA]'s administration … is performed according to the terms of [the ASA] and the [SPD]."

---

[2] The Fund's attempt, Opp. 21, to distinguish *Pharmaceutical Care Management Ass'n v. Rowe*, 429 F.3d 294, 305 (1st Cir. 2005), is particularly weak. To be sure, the First Circuit's holding that ERISA "is not designed to regulate or afford remedies against entities that provide services to plans" was made in the context of a preemption analysis, but that is the point: if a service provider were a fiduciary, state-based claims against it would be preempted. *Id.* (citation omitted). The claims were *not* preempted because the provider was *not* a fiduciary. *Id.* at 300-01, 305.

ASA at 15. However, rather than initiate an audit and "use[] a … mutually acceptable CPA firm or nationally recognized consulting firm" as required by the ASA, *id.* at 16, the Fund eschewed its formal audit rights and hired ClaimInformatics to make *guesses*, and then commenced a federal lawsuit. Regardless, even if the Fund had no audit rights, the application of negotiated rates does not suddenly become a fiduciary act because the Fund cannot double-check the extent to which BCBSMA entered the correct pricing codes for the provided health care services.

When the Fund turns to *W.E. Aubuchon Co. v. BeneFirst, LLC*, 661 F. Supp. 2d 37 (D. Mass. 2009), its analysis becomes particularly strained. The Fund cannot hide the fact that BeneFirst, the third-party administrator in that case, had far greater discretion and duties than BCBSMA here. The Fund acknowledges that BeneFirst decided "how much to pay on particular claims," Opp. 18 (citation omitted)—that is the very thing about which the Fund complains here. But BeneFirst's duties not only included repricing, it also decided, inter alia, "*which claims to pay*, *which to deny*, how much to pay on particular claims, and the degree of investigation to pursue on particular claims." *BeneFirst*, 661 F. Supp. 2d at 52 (emphasis added). In other words, BeneFirst not only provided pricing, it also *adjudicated claims*. Here, however, it is *the Fund* that "determine[s] member eligibility, the availability of benefits and claims adjudication," ASA at 4. So BCBSMA has *less* responsibility than BeneFirst did, yet somehow the Fund would have this Court believe that BCBSMA is a functional fiduciary when BeneFirst was not.

The Fund contends that, in reality, BeneFirst had less discretion than BCBSMA because it "made those decisions based on rules and requirements found in the plan sponsor's plan documents," Opp. 18, but the opinion says no such thing—in fact, it says the opposite, namely that BeneFirst's duties (which, again, included claims adjudication) "inevitably involve[d] the exercise of judgment," *BeneFirst*, 661 F. Supp. 2d at 52. By contrast, the contractual duty the Fund

challenges here is BCBSMA's obligation to take a negotiated price and perfunctorily apply it to a given claim. The Fund refers to this as "calculating negotiated rates," Opp. 18, which is largely correct—it is a job for a calculator or a computer program.

The Fund also argues that BeneFirst "'used a computerized claim processing system, which was built out to match and apply the terms of the written medical benefit plans' designed by the plan sponsor." *Id.* at 17. The opinion never says that, but regardless, that would parallel the situation here: BCBSMA applies its negotiated prices to claims and then delivers this information to the Fund, as it is contractually required to do. ASA at 5. Again, the Fund does not challenge the rates themselves, so all that is left is the potential to "'type[] an erroneous code onto a computer screen.'" Opp. 18 (quoting *IT Corp.*, 107 F.3d at 1421).

The Fund asserts that the "only discretion [BeneFirst] had resulted from the fact that '[n]ot every scenario [was] addressed in the plan.'" *Id.* (quoting *BeneFirst*, 661 F. Supp. 2d at 52 n.17). But the opinion never says—nor could it—that BeneFirst's *only* discretion was a result of gaps in the plan. Moreover, the footnote the Fund quotes—a snippet of a deposition, not the language of the Court—is cited in reference to the totality of BeneFirst's *claims adjudication* process, not just the pricing of claims. Indeed, it is clear that BeneFirst's discretionary authority went far beyond repricing; deeming BCBSMA a fiduciary on these grounds would directly conflict with *BeneFirst*.

Perhaps recognizing as much, the Fund tries another tack, arguing that *BeneFirst* "primarily concerns TPA conduct not relevant to this case," including "'erroneous reporting of an anticipated stop-loss insurance reimbursement'" and "'failure to maintain claims records.'" *Id.* at 19 (quoting *BeneFirst*, 661 F. Supp. 2d at 43). But this leaves out an entire category of errors the plaintiff pressed in *BeneFirst*—the very category identical to the Fund's claims here. As this Court explained, "BeneFirst's [alleged] malfeasance falls into three principal categories: erroneous

reporting of an anticipated stop-loss insurance reimbursement; *procedural and financial errors in claims processing*; and failure to maintain claims records." 661 F. Supp. 2d at 43 (emphasis added); *id.* at 39 ("According to plaintiffs … Benefirst made claim processing errors amounting to millions of dollars…."). The Fund mentions the first and third while leaving out the second.

The Fund's few cases are not to the contrary. Irrelevant are *Golden Star, Inc. v. Mass Mutual Life Insurance Co.*, 22 F. Supp. 3d 72 (D. Mass. 2014), and *Charters v. John Hancock Life Insurance Co.*, 583 F. Supp. 2d 189 (D. Mass. 2008), which involved service providers with near total discretion to decide their own compensation. And in *ILWU-PMA Welfare Plan Board of Trustees v. Connecticut General Life Insurance Co.*, No. 15-cv-02965, 2015 WL 9300519 (N.D. Cal. Dec. 22, 2015), the plan called for the third-party administrator to apply the "usual, customary, and reasonable" rate to claims. *Id.* at *5. The third-party administrator did not merely *err* in doing so but "set[] aside" that standard and "appli[ed] [its] own scheme[.]" *Id.* The court held that such a substantive switch constituted an "exercise[] [of] considerable discretion." *Id.* Even assuming that analysis is correct, nowhere does the Fund here allege (nor could it) that BCBSMA chose to substitute a different *standard* (e.g., substituting "usual, customary, and reasonable" rates for "negotiated rates") for claims pricing—the allegation is simply that BCBSMA made errors in applying its negotiated rates.

Finally, the Fund will not be in "no-man's land" after its federal claims are dismissed—it will simply be out of federal court. Opp. 22 n.8. The Fund's own brief makes clear that, as a practical matter, the dispute here is solely contractual. No one disputes that the ASA requires BCBSMA to apply its negotiated rates. The only question is whether BCBSMA made mistakes in applying those rates. Deciding that issue involves no federal law and no federal question. If the mere application of preexisting rates to preexisting claims is a fiduciary issue, *all* service

contractors would be fiduciaries and *all* contracts with ERISA plans would be governed entirely by federal law. Anyone who ever charges the Fund money would be a fiduciary. From the plumber to the banker, there would be no way out.[3] This is not the law, and the Fund's attempt to impose ERISA onto what are fundamentally state contract claims must fail.

## II.   BCBSMA DOES NOT HAVE CONTROL OR AUTHORITY OVER THE DISPOSITION OR MANAGEMENT OF PLAN ASSETS.

As for the claim that BCBSMA "controls" the "management or disposition" of plan assets, the Fund does not identify the assets under alleged "control." Instead, it reasserts the theory that BCBSMA "controls" plan assets because its actions *affect* plan assets. The Fund's arguments fail.

**A.** The Fund makes the irrelevant assertion that all "contributions" from participants are plan assets. Opp. 12 n.3. That is not the point; the *Fund* controls the management and disposition of those assets, not BCBSMA. As already explained, the Fund pays BCBSMA to perform a service, which includes paying providers when the Fund approves it; BCBSMA does not hold or manage plan property. MTD 7-8, 20-23. The Fund does not even argue that it has a "beneficial ownership interest" in any assets that BCBSMA actually controls. *Id.* at 20. Nor is this a matter of "BCBSMA's internal accounting methods," Opp. 14; the *parties agreed* to this payment arrangement. MTD 7-8; ASA 16-17.[4] To the extent there was any doubt, the First Circuit's decision in *In re Fidelity ERISA Float Litigation*, 829 F.3d 55 (1st Cir. 2016), explicitly holds that when

---

[3] Ironically, even while identifying no limiting principle for its own theories, the Fund accuses BCBSMA of trying to immunize all third-party administrators from fiduciary status. Opp. 9. But BCBSMA *already* gave examples of fiduciary functions that third-party administrators can take on, such as benefits determinations. MTD 13. The point is that BCBSMA is not a fiduciary *here*.

[4] The Fund suggests that unless providers are paid with plan assets, it would mean the "Plan *never* pays benefits." Opp. 14. All it means is that the plan has arranged to pay BCBSMA (from plan assets) and that BCBSMA pays providers directly (from its own accounts). The Fund does not explain why this arrangement fails to "comport" with ERISA or trust law. *Id.*

intermediaries transfer cash, in circumstances parallel to this case, the cash is not a plan asset while in transit.[5]

**B.** Rather than identify plan assets that BCBSMA actually controls, the Fund goes all-in with the erroneous argument that BCBSMA controls plan assets because "BCBSMA's decisions clearly *impact* Plan assets." Opp. 15 (emphasis added). As BCBSMA already explained, MTD 23-24, the question is not whether BCBSMA "adversely affected" the plan, *Livick v. The Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008) (citation omitted), but whether BCBSMA controls the "management" or "disposition" of plan assets, 29 U.S.C. § 1002(21)(A); *see also, e.g.*, *DeLuca*, 628 F.3d at 747; *Doe 1 v. Express Scripts, Inc.*, 837 F. App'x 44, 49 (2d Cir. 2020).

The Fund has no meaningful response. For instance, in *DeLuca*, the court explained that a "decision that [merely] has an effect on an ERISA plan [is] not subject to fiduciary standards." *DeLuca*, 628 F.3d at 747 (citation omitted). The Fund tries to distinguish *DeLuca* on the basis that the plaintiffs in *DeLuca* challenged the *negotiation* of rates, while the Fund challenges the *application* of those rates. Opp. 20-21. That is a distinction without a difference. The point is that decisions merely *affecting* an ERISA plan are not fiduciary—even decisions, like the negotiation of rates, with an effect far greater than any effect of clerical errors in applying those rates.

Simple hypotheticals reinforce this point. Suppose that the Fund *directly* paid providers, at their standard rates, and a hospital bills the Fund $10,000 for a back surgery that should have been priced at $5,000. The Fund can choose to cover the claim or not cover it; it can choose to pay a certain portion or not. But the hospital does not become a fiduciary simply because it *relays an*

---

[5] Contrary to the Fund's argument, Opp. 15, *In re Fidelity* was entirely about whether assets in intermediate accounts were "plan assets." *E.g.*, 829 F.3d at 63 ("[ Plaintiffs'] causes of action … necessarily depend on [the funds] being a plan asset."); *id*. at 59 n.6 ("[W]e conclude that plaintiffs have not alleged facts showing that [the funds] should be treated as a plan asset.").

*erroneous price to the Fund*; that is true even if the hospital uses "innumerable complex algorithms, factors, rules, and exceptions," *Id.* at 17, in the process. Yet under the Fund's theory, that hospital made a fiduciary error because its mistake *affects* plan assets. That is not the law.

Given the Fund's expansive theory, it is not surprising that its cited cases are inapposite. Neither *TML Recovery, LLC v. Cigna Corp.*, No. 20-cv-00269, 2021 WL 3730168, at *4 (C.D. Cal. July 26, 2021), nor *In re Out-of-Network Substance Use Disorder Claims Against UnitedHealthcare*, No. 19-cv-2075, 2021 U.S. Dist. LEXIS 74098, at *13 (C.D. Cal. Apr. 14, 2021), even involved a question regarding plan assets. In both cases, third-party administrators were fiduciaries because they were "delegated" the "discretionary authority to determine … benefits." *Id.*; *TML Recovery*, 2021 WL 3730168 at *4. The Fund's only case that touches on plan assets, *RJ v. Cigna Behavioral Health, Inc.*, No. 20-cv-02255, 2021 WL 1110261, at *7 (N.D. Cal. Mar. 23, 2021), held that a third-party administrator had authority over plan assets because, among other things, it "negotiat[ed] and repric[ed] patient claims." This case, too, is inapposite, since the Fund does not allege that BCBSMA negotiates patient claims. That said, to the extent that *RJ* suggests that merely *affecting* plan assets is sufficient to impose fiduciary status, it is an outlier,[6] not yet subject to appellate review, which should be rejected.

Indeed, this Court has *already* rejected that view. For example, in *BeneFirst*, the third-party administrator had nominal control over plan assets: it had check-writing authority, and it directly received certain participant premiums and overpayments. 661 F. Supp. 2d at 54. Moreover, as

---

[6] Notably, the case on which *RJ* relied, *Monterey Peninsula Horticulture, Inc. v. Emp. Benefit Mgmt. Servs., Inc.*, No. 20-cv-01660, 2020 WL 2747846, at *3 (N.D. Cal. May 27, 2020), does not support such a holding; the court there held that a third-party administrator controlled the disposition of plan assets because it adjudicated claims and "was responsible for 'issu[ing] checks from [*the plan's*] Account to pay approved claims.'" That holding relies on *actual* control over a plan account, not an argument that "affecting" plan assets is sufficient.

noted above, *BeneFirst* had *extensive* authority over claims processing, including claims adjudication, benefits allocation, and investigatory authority. *Id.* at 52. All of this authority *affected* plan assets. Nevertheless, this Court held that BeneFirst lacked control over the *management or disposition* of plan assets. *Id.* at 54. It would be "fundamentally inconsistent" to hold that authority over claims processing is not fiduciary, *id.* at 54, only to turn around and decide that it *is* fiduciary because mistakes in claim processing "impact" plan assets, Opp. 15.

The Fund's final argument on plan assets is that BCBSMA "assume[d]" the role of a fiduciary by keeping its proprietary contracts confidential. *Id.* at 16. How this fact pertains to "control" over the "disposition" of plan assets is at best unclear. BCBSMA reprices claims; whether BCBSMA's provider network contracts are confidential has no effect on what *property* belongs to whom. Plus, as noted above, the Fund *has* audit rights but declined to use them, so the Fund's repeated protestations about "secrecy" are a red herring. And even if the Fund did not have contractual audit rights, the Fund is the entity with the fiduciary duty to administer the plan. If the trustees failed to negotiate contracts that guarantee the Fund sufficient oversight, they only have themselves to blame, and in all events that has nothing to do with controlling plan assets. If it did, then plan sponsors would have the right, under *federal law*, to examine the internal books of any contractor, plumber, property manager, or other benefit plan service provider, *regardless* of what the parties actually contracted for, simply because the service provider *might* make a mistake in pricing. Again, the Court should reject this attempt to turn all contract claims into ERISA claims.

## III.   BCBSMA IS NOT A NAMED FIDUCIARY.

The Fund also argues that BCBSMA is a "named" fiduciary, without identifying where BCBSMA is actually named. Opp. 8. (citing 29 U.S.C. § 1102(a)(2)). The Fund's SPD names some fiduciaries, but not BCBSMA. For instance, "[participants], [their] dependents and those acting on … their behalf including attorneys will be fiduciaries to the Fund with respect to the

portion of any recovery that is subject to reimbursement until it is actually received by the Fund." SPD 43. No similar language identifies BCBSMA as a fiduciary, nor does the Fund assert that "an employer or employee organization" identified BCBSMA as a fiduciary pursuant to a "procedure" laid out in the plan. 29 U.S.C. § 1102(a)(2).

Although the whole point of "naming" a fiduciary is to *expressly* identify them, the Fund's paradoxical argument is that BCBSMA is *impliedly* named. The Fund asserts that because the SPD refers to "fiduciaries" in the plural, there must be more than one fiduciary, and BCBSMA is the only available suspect. Opp. 8. Even accepting this tenuous grammatical contention, the SPD *does* name other fiduciaries, *e.g.*, SPD 43—just not BCBSMA. The Fund is also flatly wrong when it says that "the SPD explains that the Plan's fiduciaries include 'other individuals with delegated responsibility,' who 'will have discretionary authority to interpret the terms of the Plan.'" Opp. 8. The SPD *does not say* that these entities are fiduciaries. It says only that "other individuals with delegated responsibility" will "have discretionary authority to interpret the terms of the plan." SPD 47. This is little more than a tautology, but in any event, it does not say that individuals with delegated authority are *named fiduciaries*, much less fiduciaries with respect to the actions the Fund challenges. *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000); MTD 11. The Fund's analogy to *BeneFirst* thus fails. There, through a series of logical steps, the plan actually *did* identify BeneFirst as a fiduciary. *BeneFirst*, 661 F. Supp. 2d at 49. The SPD here does not.

## IV. THE FUND'S THIRD COUNT FAILS BECAUSE BCBSMA IS NOT A FIDUCIARY.

The Fund erroneously asserts that its third count can survive even if BCBSMA is not a fiduciary. In the Fund's view, every time that BCBSMA makes a clerical error, it violated the plan's "Negotiated Rate Mandate," and the Fund can sue to enjoin further violations under 29 U.S.C. § 1132(a)(3). Opp. 24. This claim fails because BCBSMA is not a fiduciary, so it has no obligations under the plan, *qua* plan. As a non-fiduciary, BCBSMA's duties are contractual. So

14

while the ASA may incorporate the relevant plan documents, any violation of those terms is a *contract* violation, not a *plan* violation. Any other outcome would "expand the substantive reach of ERISA," which § 1132(a)(3) does not do. *Reich v. Rowe*, 20 F.3d 25, 29 (1st Cir. 1994).

To be sure, if BCBSMA knowingly participated in a fiduciary breach, the Fund might be able to rely on § 1132(a)(3). *E.g.*, *LD v. United Behav. Health*, 508 F. Supp. 3d 583, 598 (N.D. Cal. 2020). But the Fund has not alleged BCBSMA's "'knowing participation in'" such a breach. *Id.* That is because, unless BCBSMA is a fiduciary, the Fund has identified neither a breach of fiduciary responsibilities, nor "the original wrongdoer," with whom BCBSMA supposedly participated in a fiduciary breach. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000) (citation omitted). Indeed, the Fund has identified no relevant case in which a non-fiduciary was found liable absent such circumstances. So, again, unless BCBSMA was *actually* the fiduciary, there was no fiduciary breach and no one to enjoin under § 1132(a)(3).[7]

## V. THE COURT SHOULD NOT EXERCISE SUPPLEMENTAL JURISDICTION.

The Fund provides no reason to maintain jurisdiction over its state-law claims if the federal claims are dismissed. In that scenario, the only remaining claims would be based on a services contract governed by state law. Such a dispute does not involve the interpretation of federal law or an ERISA plan but simply whether BCBSMA breached its contract with the Fund. These "[n]eedless decisions of state law should be avoided," *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966), and the Fund's state-law claims should be dismissed.

### CONCLUSION

The Court should dismiss the Fund's Amended Complaint in its entirety.

---

[7] BCBSMA did not have to repeat its entire argument regarding fiduciaries to avoid "waiv[ing]" it with respect to count three. Opp. 23; *cf. Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 60 n.17 (1st Cir. 1999) (only "'cursory and conclusory'" arguments in briefs are forfeited).

Dated: September 10, 2021                    */s/ David T. Raimer*

Evan Miller*
David T. Raimer*
Stephen J. Petrany
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3939
dtraimer@jonesday.com

*Counsel for Defendant*
*Blue Cross Blue Shield of Massachusetts, Inc.*

*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Reply was filed on September 10, 2021, via the

Court's electronic filing system, which will deliver copies of the filings to counsel of record.

<u>/s/ David T. Raimer</u>
David T. Raimer*
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3939
dtraimer@jonesday.com

*Admitted pro hac vice*

17