# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MASSACHUSETTS LABORERS'** ) | |
| **HEALTH AND WELFARE FUND and** ) | |
| **TRUSTEES OF THE MASSACHUSETTS** ) | |
| **LABORERS' HEALTH AND WELFARE** ) | |
| **FUND, as fiduciaries,** ) | |
| ) | |
| **Plaintiffs,** ) | **Civil Action No.** |
| ) | **21-10523-FDS** |
| **v.** ) | |
| ) | |
| **BLUE CROSS BLUE SHIELD OF** ) | |
| **MASSACHUSETTS,** ) | |
| ) | |
| **Defendant.** ) | |

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

**SAYLOR, C.J.**

This is a case arising out of the administration of a union health-benefit plan.  Plaintiff Massachusetts Laborers' Health and Welfare Fund (the "Fund") operates a self-funded multi-employer health-benefit plan (the "Plan") for its members.  The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

The Trustees of the Plan hired defendant Blue Cross and Blue Shield of Massachusetts to be a third-party administrator for the Plan.  The Fund has brought suit against Blue Cross alleging breaches of fiduciary duties under ERISA and violations of state law.  According to the Fund, Blue Cross violated its fiduciary duties and the terms of the plan by failing to process claims correctly, overpaying benefits, neglecting to recoup overpayments properly, and refusing to provide the information needed by the Fund to verify that claims were priced appropriately.

Blue Cross has moved to dismiss the complaint for failure to state a claim.  The central

question, for present purposes, is whether Blue Cross is a fiduciary of the Plan.  Blue Cross contends that as a third-party administrator, its obligations to the Fund are solely contractual in nature, not fiduciary, and that accordingly this dispute is not governed by ERISA.  Blue Cross further asserts that the Court should decline to exercise its supplemental jurisdiction over the remaining state-law claims.

For the reasons set forth below, the motion to dismiss will be granted.

## I.   <u>Background</u>

### A.   <u>Factual Background</u>

The facts are set forth as alleged in the complaint unless otherwise noted.

#### 1.   <u>The Parties</u>

The Massachusetts Laborers' Health and Welfare Fund provides a self-funded multi-employer health-benefit plan to members of the Laborers' Local Union in Massachusetts and parts of northern New England.  (Am. Compl. ¶ 7).  The Plan is governed by ERISA and is superintended by the Trustees of the Fund, who are fiduciaries of the Plan.  (*Id.* ¶¶ 8, 10).

Blue Cross Blue Shield of Massachusetts is a licensed health-insurance company headquartered in Boston, Massachusetts.  (*Id.* ¶ 11).  Among other things, Blue Cross is a preferred-provider organization ("PPO"), meaning that it has established a network of health-care providers with which it has negotiated rates for services.  (*Id.* ¶ 18).  Presumably because of the size and volume of its business, Blue Cross has generally been able to negotiate favorable rates with those providers.  (*See id.*).  The establishment and maintenance of that PPO, and the negotiation of those rates, has occurred independently of any relationship between Blue Cross and the Fund.

#### 2.   <u>Plan Administration</u>

In 2006, the Fund hired Blue Cross to provide administrative services to the Plan.  (*Id.*

¶¶ 28, 30).  The agreement between the Fund and Blue Cross is governed by an Administrative Services Account Agreement ("ASA"), which has been renewed annually since its original execution in May 2006.  (*Id.* ¶ 30).

The ASA governs how Blue Cross processes claims, recoups or settles erroneously paid benefits, provides Fund members access to its network of providers and negotiated rates, and assesses fees charged to the Fund.  (ASA at 1, ECF No. 16-2). [1]

### a.     Administrative Services Account Agreement

The ASA provides that Blue Cross is obligated to perform "certain administrative services in connection with the Fund's self-insured group health plan."  (*Id.* at 1).  The ASA outlines its duties and responsibilities as follows:

> Blue Cross and Blue Shield has been designated by the fund to provide certain administrative services for its group health plan, including arranging for a network of health care providers whose services are covered by the group health plan, providing services to network providers, claims processing, individual case management, medical necessity review, utilization review, quality assurance programs and disease monitoring and management services.

(*Id.* at 6).

In addition, the ASA describes the roles of the parties under ERISA:

> The Trustees are the "administrator" and "named fiduciary" of the Fund as that term is defined in Section 3(16)(A) and 402(a), respectively, of ERISA.  Blue Cross and Blue Shield is engaged as an independent contractor to perform the specific duties and responsibilities which the Trustees delegate to it.  It is understood and agreed that Blue Cross and Blue Shield exercises its duties within the framework of the Plan of Benefits established by the Trustees.  Blue Cross and Blue Shield and the Trustees of the Fund accept that the definitions of a fiduciary are contained in ERISA Section 3(21)(A).

---

[1] Excerpts of the ASA and SPD, although not attached to the complaint, were submitted with Blue Cross's motion to dismiss.  Because the Fund has not challenged their authenticity, they are properly before the Court. *Beddall v. State St. Bank & Tr. Co.*, 137 F. 3d 12, 17 (1st Cir. 1998) ("When, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

(*Id.* at 1).

### a.      Administrative Fee and Working Capital Amount

In exchange for the services of Blue Cross, the Fund pays an administrative fee.  (*Id.* at 16).  In addition, "[b]ecause [Blue Cross] will pay providers of services before being able to bill the Fund," the Fund pays a "working capital amount" to Blue Cross "for estimated Claim Payments."  (*Id.*).  The working capital amount is based on Blue Cross's "estimate of the amount needed to pay claims on a current basis, subject to review and approval by the Fund."  (*Id.*).  From that amount, Blue Cross pays claims to hospitals, physicians, and other health-care providers.

Although both the administrative fee and working capital amount are determined monthly, the Fund pays those charges in weekly installments "in the pre-determined amounts approved by both parties."  (*Id.* at 16-17).  At the end of each month, Blue Cross performs a "settlement calculation" where it calculates the actual administrative fees incurred that month and the total amount paid in claims.  (*Id.* at 17).  If, at the end of the month, the actual administrative charges and claim totals exceed the Fund's payment for that month, the Fund pays Blue Cross the difference in the next weekly payment.  (*Id.*).  If the Fund has overpaid, Blue Cross credits the difference to the Fund's next payment.  (*Id.*).

Blue Cross sends the Fund various statements of paid claims and administrative charges on a monthly basis, as well as periodic reports of adjustments and interest payments (incurred if the Fund is untimely with its return of claim approvals) and a monthly settlement summary invoice.  (*Id.*).

In the event the Fund disputes a monthly charge, it must notify Blue Cross of the disputed amount.  (*Id.*).  The Fund is still obligated, however, to pay the amount Blue Cross charges.  (*Id.*).  If Blue Cross confirms that the disputed amount was not the Fund's responsibility, then

Blue Cross credits that amount to the Fund's next payment.  (*Id.* at 17-18).

**b.      Maintenance of Provider Network and Negotiation of Rates**

The ASA specifically acknowledges that Blue Cross maintains a network of preferred

providers through its own contractual arrangements.  (*Id.* at 6).  Blue Cross is required by the

ASA to make that network—and by extension, the favorable rates that it has negotiated with

providers—available to Plan participants:

> Blue Cross and Blue Shield will make its PPO network of preferred health care
> providers available to Participants in the Plan as provided in this Agreement.  The
> Fund will have no responsibility for maintaining or administering the network on
> behalf of Participants . . . Blue Cross and Blue Shield will use commercially
> reasonable efforts to maintain the network as a competitive and cost effective
> network of providers.

(*Id.* at 7).

The ASA expressly permits Blue Cross to exercise discretion when negotiating rates with

health-care providers for services:

> Blue Cross and Blue Shield may negotiate different claim payment rates and
> arrangements with its providers and/or vendors . . . These claim payment rates and
> arrangements may vary based upon the type of health benefit plan, account-
> specific enrollment . . . and/ or product funding arrangement . . . from rates that
> may be otherwise assessed by providers and/or vendors and may reflect various
> negotiated discounts and factors (including but not limited to initial markdowns,
> rebates, volume, and other pricing concessions which may be based on all or a
> subset of Blue Cross and Blue Shield's book of business).

(*Id.*).  According to the ASA, the Fund agrees that those negotiated rates determine the claim-

payment rates paid by the Fund:  "The Fund acknowledges and agrees that it is entitled only to

those claim payment rates and provider/vendor arrangements that Blue Cross and Blue Shield

offers to self-insured plans and that it approves the use of such rates and arrangements applied on

behalf of its self-insured health benefit plans."  (*Id.*).

**c.      Processing of Claims**

Blue Cross is responsible for processing claims on behalf of the Fund.  (*Id.* at 4-5).  When

5

a beneficiary submits a claim, Blue Cross reprices the claim according to its provider arrangements. (*Id.* at 5). It then transmits the claim to the Fund to determine "member eligibility, the availability of benefits and claims adjudication." (*Id.* at 4). After the Fund makes its determination, it transmits the adjudicated claim information back to Blue Cross for payment and reporting. (*Id.* at 5).

Blue Cross evaluates a claim by conducting "a medical necessity and utilization review of inpatient urgent, nonurgent, and concurrent care claims using the Blue Cross and Blue Shield medical policy, medical technology assessment guidelines and utilization review policies and procedures as set forth in the Benefit Description . . . ." (*Id.* at 4). However, final approval for a claim lies with the Fund. (*Id.* at 5). In the event a participant disputes the evaluation or adjudication of a claim, the Fund is responsible for processing and deciding claim appeals. (*Id.* at 10).

### d.    <u>Recovery of Erroneous Payments</u>

According to the ASA, if the Fund identifies an error after authorizing the claim, the Fund can notify Blue Cross to halt payment. (*Id.* at 6). However, if payment has already been disbursed, Blue Cross must seek to recover the payment according to the claim-adjudication process it has established with the provider. (*Id.*). If the erroneous payment resulted from an error by the Fund in authorizing and adjudicating the claim, the Fund bears responsibility for the incorrect payment. (*Id.*). Conversely, if the erroneous payment resulted from an error made by Blue Cross, then Blue Cross bears responsibility. (*Id.*).

The ASA also provides avenues for recovery when the error is attributable to a third party. When claims are paid as a result of third-party fraud or abuse, Blue Cross may seek recovery directly or through "appropriate recovery operations," which include subrogation and provider claim-payment audits. (ASA 2010 Amendment at 1). If Blue Cross recovers any

portion of the payments, it credits the Fund the recovered payment, less a 20% fee.  (*Id.*).

According to the ASA, Blue Cross may, in the course of its ongoing operations, identify claims for which Blue Cross, on behalf of the Fund, paid the incorrect amount.  (ASA 2015 Amendment at 6).  Such errors may be attributable to "the use of incorrect claim payment rates, Medicare secondary payer issues, disagreements on provider payment policies, or other similar situations."  (*Id.*).  When Blue Cross identifies such errors, the ASA states that it should reprocess the impacted claim and credit or bill the Fund accordingly.  (*Id.*).  However, if reprocessing the claim is "not administratively practical or reasonable," Blue Cross may "instead negotiate a settlement with the provider."  (*Id.*).  Blue Cross will then credit or bill the Fund based on the settlement.  (*Id.*).

### e.    Audits

According to the ASA, the Fund has the right to request an audit of Blue Cross's records to ensure that it conducts its administrative responsibilities in accordance with the ASA.  (ASA at 15).  The Fund may initiate an audit by notifying Blue Cross through a written letter that outlines the purpose and objectives of the audit, its scope, the sampling methodology of the auditors, a description of the data requirements, and a proposed timetable.  (*Id.*).  The Fund or its designated auditor coordinates the audit with Blue Cross's Audit and Controls division, and the audit must be conducted in accordance with the ASA and any applicable Blue Cross policies. (*Id.*).

### f.    Confidentiality

As noted, Blue Cross has created, and maintains, a PPO network that exists and operates independently of its relationship with the Fund.  While the ASA permits Fund participants to take advantage of the PPO network, it does not give the Fund complete access to the business dealings of Blue Cross.  Accordingly, the ASA states the following:

> Each party will retain ownership and control over their respective systems, trade secrets, provider reimbursement arrangements, procedures, methodologies, and practices used in connection with the performance of its responsibilities under this Agreement ("Proprietary Information").  All claim history, utilization data and individually identifiable health information pertaining to these claims developed by each party hereto during the term of this Agreement ("Personal Information") will be the sole and exclusive property of such party.

(ASA at 14).

### g.      Summary Plan Description

The Plan's written terms are summarized in a Summary Plan Description ("SPD"), which provides participants with information regarding Plan benefits.  (Am. Compl. ¶ 17).

The SPD explains to Plan participants that the Fund entered into an agreement with a PPO that contracts with healthcare providers to provide medical services at discounted rates. (SPD at 13, ECF No. 16-2).  It states that the Fund's PPO for "most medical expenses" is Blue Cross.  (*Id.*).

The SPD sets forth the extent of the Plan's medical coverage.  It informs participants that the "billed charges that will be considered covered expenses will never be more than the negotiated rate (if you use a PPO provider) or the reasonable and customary charges."  (*Id.* at 15).[2]  Participants bear the cost of their share of covered expenses, as set forth under the Plan terms, and any amount that exceeds the covered expenses.  (*Id.*).  The SPD informs participants that when they seek care from an in-network provider, that provider is paid directly by Blue Cross.  (*Id.* at 23).

The SPD also describes the duties of various parties to the Plan.  It states that the Trustees of the Fund have discretionary authority to delegate responsibility and that those designees may

---

[2] The Fund refers to this term as the "Negotiated Rate Mandate."  As discussed below, it contends that this term in the SPD requires Blue Cross to apply the rates it negotiates with providers to the Fund's claims.

have discretionary authority to interpret Plan terms:

> In carrying out their respective responsibilities under the Plan, the Board of Trustees, the Fund Administrator and other individuals with delegated responsibility for the administration of the Plan will have discretionary authority to interpret the terms of the Plan and to determine eligibility and entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation or determination will be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(*Id.* at 47).

In addition, the SPD states that ERISA imposes legal responsibilities upon Plan fiduciaries:

> In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of employee benefit plans.  The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

(*Id.* at 49).  The SPD further states if that duty is breached, a beneficiary may file suit:  "If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor or you may file suit in Federal court."  (*Id.* at 50).

### 3.  Alleged Violation of Plan Terms

#### a.  Alleged Concealment of Information

According to the complaint, Blue Cross has consistently refused to provide the Fund with access to its internal policies and procedures that relate to the negotiation of prices with the providers in the PPO.  (Am. Compl. ¶ 53).  It further alleges that Blue Cross also refused to grant the Fund access to information concerning provider contracts and that Blue Cross actively conceals its methodology for determining "covered charges" under the Plan.  (*Id.* ¶¶ 55-56).  The withholding of that information, the complaint alleges, makes it impossible for the Fund to verify that Blue Cross does not overpay for claims.  (*See id.* ¶¶ 55, 58).

####         b.        Alleged Claim Errors

In July 2018, the Fund hired ClaimInformatics, LLC, a company that provides healthcare claim payment review services, to audit claims that were priced, processed, and paid by Blue Cross on behalf of the Fund between 2016 and 2018.  (*Id*. ¶¶ 62-63).

According to the complaint, ClaimInformatics identified 5574 erroneous claims that had resulted in the Fund paying $1,402,687.57 in excess benefits.  (*Id.* ¶ 64).[3]  Those alleged claim errors also resulted in Plan participants and beneficiaries paying $32,810.74 in unnecessary charges through mistakenly paid deductibles or claims made against coinsurers.  (*Id.*).  The complaint provides various examples of specific alleged violations of the Plan and errors in claims processing.

The complaint further alleges that Blue Cross has a policy of paying inflated claims up-front and auditing them only after the fact.  (*Id.* ¶ 80).  For example, in May 2021 the Fund allegedly challenged Blue Cross's decision to process a claim when a provider billed three hours of services for a minor procedure typically completed in minutes.  (*Id.*).  When the Fund questioned Blue Cross about the claim, it responded that its policy was to audit such claims on a "post pay basis."  (*Id.*).

The complaint alleges that Blue Cross paid itself unauthorized recovery fees.  (*Id.* ¶ 81).  For example, according to the complaint, Blue Cross wrongly collected a recovery fee when a hospital, on its own accord, revised a billing statement and no recovery of overpayment was necessary.  (*Id.*).   It also allegedly raised the recovery fee from 20% to 30% without first obtaining approval from the Fund and often paid itself recovery fees for overpayments that

---

[3] Blue Cross contends that all of the allegedly erroneous claims were in fact properly paid, with the exception of some *de minimis* errors, which it has offered to refund.  (BCBS Mem. at 1).

resulted from its own error.  (*Id.* ¶¶ 52, 81).  According to the complaint, Blue Cross often calculates recovery fees incorrectly by basing the fee amount on the price of the entire claim rather than the amount of the overpaid funds.  (*Id.* ¶ 81).

The complaint alleges that Blue Cross charged the Fund unauthorized commission fees. (*Id.* ¶ 82).  According to the complaint, in March 2021, the Fund discovered that Blue Cross had charged quarterly commission fees on savings the Fund accrued from audits of out-of-network claims.  (*Id.*).  According to the complaint, the Fund never consented to such fees, and Blue Cross continues to bill those fees to the Fund.

The complaint alleges in general terms that the efforts of Blue Cross to recover overpayments are insufficient.  It alleges that Blue Cross does not conduct recovery operations on an ongoing basis and that it only does so insofar as those recovery efforts benefit its own interests.  (*Id.* ¶ 84).

### c.      Alleged Blocking of Independent Recovery of Overpayment

According to the complaint, based on the alleged failure of Blue Cross to recover overpayments, the Fund authorized ClaimInformatics to recover $1.4 million in overpayments that had been identified in its review.  (*Id.* ¶ 85).  ClaimInformatics began sending letters to providers and collecting refunds.  (*Id.* ¶¶ 87-88).  In response, Blue Cross requested that the Fund cease its recovery efforts, contending that ClaimInformatics's communications with providers on behalf of the Fund violated the ASA, and contacted providers and instructed them to ignore notices of overpayment from the Fund.  (*Id.* ¶¶ 87-90).

### d.      Alleged Refusal to Provide Supporting Documentation for Audit

After the Fund ceased attempts to recover alleged overpayments independently, ClaimInformatics submitted to Blue Cross for review a sample of claims where benefits were

allegedly overpaid.  (*Id.* ¶ 94).  According to the complaint, Blue Cross asserted that it had audited the claims and that they had been billed correctly.  (*Id.* ¶ 96).  However, Blue Cross allegedly refused to provide corroborating records, leaving the Fund unable to verify those findings.  (*Id.* ¶¶ 96, 100).  Throughout its discussions with the Fund concerning the overpayment of claims, BlueCross maintained that ClaimInformatics's findings were incorrect and refused to provide information concerning Blue Cross's contracts with providers.  (*Id.* ¶ 101).  According to the complaint, Blue Cross asserted that it had audited claims and that the claims had been processed without error.  (*Id.* ¶ 102).  However, Blue Cross allegedly refused to show the Fund the relevant records.  (*Id.*).

### B.   Procedural Background

The amended complaint asserts three claims arising under ERISA:  Count 1 alleges a breach of fiduciary duty in violation of 29 U.S.C. § 1109; Count 2 alleges engagement in prohibited transactions in violation of 29 U.S.C. § 1106(b)(1); and Count 3 seeks injunctive relief for violations of ERISA and Plan terms in accordance with 29 U.S.C. § 1132(a)(3).

The complaint also asserts four claims arising under state law:  Count 4 seeks an equitable accounting; Count 5 alleges breach of contract; Count 6 alleges breach of the implied covenant of good faith and fair dealing; and Count 7 alleges unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A, § 9.

## II.   Legal Standard

To survive a motion to dismiss, a complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When

determining whether a complaint satisfies that standard, a court must assume the truth of all well-

pleaded facts and give the plaintiff the benefit of all reasonable inferences.  *See Ruiz v. Bally*

*Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75,

77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual

allegations, either direct or inferential, respecting each material element necessary to sustain

recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir.

2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir.

2005)).

## III.   Analysis

Blue Cross has moved to dismiss the federal claims for failure to state a claim upon

which relief can be granted.  It further contends that if the ERISA claims are dismissed, the court

should refrain from exercising supplemental jurisdiction over the related state-law claims.

### A.   Whether Blue Cross Is a Fiduciary

Count 1 alleges that Blue Cross breached its fiduciary duty to the Plan in violation of 29

U.S.C. § 1109.  Count 2 alleges that Blue Cross, despite being a Plan fiduciary, acted in its own

interests when dealing with Plan assets, thereby violating 29 U.S.C. § 1106(b)(1).  The threshold

issue in assessing the viability of both claims, therefore, is whether Blue Cross owed a fiduciary

duty to the Fund.

There are two methods by which fiduciary status may be attributed to an entity under

ERISA.  First, that entity can be a "named" fiduciary—that is, in accordance with statutory

requirements, the entity is named as a fiduciary in the plan documents.  Second, that entity can

be a "functional" fiduciary—that is, fiduciary status can arise from the exercise of discretion or

control with respect to the management or assets of the plan.  *See Beddall v. State St. Bank & Tr.,*

*Co.*, 137 F.3d 12, 18 (1st Cir. 1998).

### 1.      Named Fiduciary

The Fund first contends that Blue Cross is a named fiduciary of the Plan.  ERISA provides that "[e]very employee benefit plan . . . shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan."  29 U.S.C. § 1102(a)(1).  A named fiduciary must be identified "in a plan instrument or pursuant to a procedure specified in that instrument."  *In re Fidelity ERISA Fee Litig.*, 990 F.3d 50, 55 (1st Cir. 2021).

The ASA expressly provides that "[t]he Trustees are the . . . 'named fiduciary' of the Fund as that term is defined in [ERISA]."  (ASA at 1).  The ASA does *not* expressly name Blue Cross as a fiduciary, and the Fund does not contend otherwise.

Nonetheless, the Fund cites to portions of the SPD that it contends raise a plausible inference that Blue Cross is a named fiduciary of the Plan.  Specifically, the Fund points to excerpts from the SPD that refer to plan "fiduciaries," using the plural term.  (*See e.g.*, SPD at 49-50).  For example, in the section of the SPD titled "Your ERISA Rights" is the following passage:

> In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of employee benefit plans.  The people who operate your plan, called 'fiduciaries' of the plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

(SPD at 49).  Because the SPD refers to "fiduciaries" (plural), the Plan contends that Blue Cross must therefore be a named fiduciary because to hold otherwise would leave the Trustees as the sole "fiduciary" (singular).[4]

---

[4] The word "Trustees," of course, is itself a plural noun.

That argument is unconvincing, to say the least.  It rests completely on the inference that the use of a plural noun necessarily implies the existence of at least one other fiduciary, and that the third-party administrator must be the hidden object of the plural reference.  Such an oblique reference in one passage of the SPD is far from sufficient to transform the third-party administrator of an ERISA plan into a named fiduciary.[5]

The Fund also contends that (1) because the SPD defines "individuals with delegated responsibility for the administration of the Plan" as having the discretion to "interpret the terms of the Plan" and determine "eligibility and entitlement to Plan benefits," therefore (2) those designees are fiduciaries of the Plan.  (SPD at 47).  Blue Cross, according to the Fund, is such a designee.  But that is simply an argument that Blue Cross is a functional, rather than a named, fiduciary.[6]

Accordingly, there is no evidence that Blue Cross is a named fiduciary of the Plan.  The Court will therefore turn to the question of whether it is a functional fiduciary.

## 2.   __Functional Fiduciary__

Under ERISA, an entity not specifically named as a plan fiduciary may nonetheless be characterized as a "functional" fiduciary, depending on its responsibilities to the plan.  The statute provides that that

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary

---

[5] The SPD also informs participants that they, too, might become "fiduciaries" of the Fund if they receive reimbursements to which the Fund has subrogation rights.  (SPD at 43).  In that context, the plural form of "fiduciary" refers to functional fiduciaries—that is, those participants who find themselves in possession of Fund assets.

[6] The Fund also points to statements that charges billed under the plan "will never be more than the negotiated rate," (SPD at 15), and that Blue Cross is an "organization through which benefits are provided," (SPD at 48).  Again, at most, that is an argument that Blue Cross is a functional fiduciary.

responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Although the statutory language appears to be somewhat expansive, in practice courts have construed that language narrowly. *See, e.g.*, *Beddall*, 137 F.3d at 21 (referring to "ERISA's somewhat narrow fiduciary provisions").

Whether a party is accurately characterized as a "functional fiduciary" depends on whether that entity "undertakes discretionary tasks related to the plan's management and administration." *Livik v. Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008); *see also Beddall*, 137 F.3d at 18 (1st Cir. 1998) ("The key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets . . . ."). An entity's status as a functional fiduciary, though, "is not an all-or-nothing designation." *In re Fidelity*, 990 F.3d at 55. "A person or entity can be a fiduciary of a plan for some purposes and not for others." *Id.* The determinative inquiry is "whether that [entity] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

The Fund contends that Blue Cross acted as a functional fiduciary because it exercised both discretionary authority and control over the administration and management of the Plan and authority and control respecting the management and disposition of Plan assets. Blue Cross contends that the functions it performs are typical third-party administrator services, effectively indistinguishable from similar arrangements that have been upheld repeatedly by federal courts.

### a. Discretionary Authority over Plan Administration and Management

Blue Cross contends that it performed typical third-party administrator tasks that do not give rise to a fiduciary duty. Specifically, it contends that the activities alleged in the

complaint—such as the processing and pricing of claims and the recovery of erroneous payments—are acts governed by the terms of the ASA and not subject to meaningful discretion on the part of Blue Cross.  To the extent there are disputes, it argues, they are simply contract disputes, not breaches of fiduciary duty.  *See Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 305 (1st Cir. 2005) (holding that ERISA "is not designed to regulate or afford remedies against entities that provide services to plans").

In general, a third-party administrator of an ERISA benefit plan is not a functional fiduciary if it performs "purely ministerial functions . . . within a framework of policies, interpretations, rules, practices, and procedures" set forth by the plan sponsor.  *Livik*, 524 F.3d at 29.  A third-party administrator, therefore, may provide important services to a plan—such as processing claims, calculating benefits, applying the benefit-plan rules to determine benefit eligibility, and collecting contributions—without incurring fiduciary responsibilities, as long as the plan sets forth the framework governing those functions.  *See* 29 C.F.R. § 2509.75-8 (D-2); *see also Beddall*, 137 F.3d at 18 ("[T]he mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary status."); *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 679 (S.D.N.Y. 2018) (stating that when "a service provider . . . acts pursuant to the terms of a contract, it does not exercise discretionary authority"); *Santana v. Deluxe Corp.*, 920 F. Supp. 249, 254 (D. Mass. 1996) (stating that courts have "universally ruled" that when a third-party administrator does not adjudicate claims it is not an ERISA fiduciary); *but see Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of N.C.*, 438 F. Supp. 3d 599, 605 (W.D.N.C. 2020) (denying motion to dismiss because allegations that Blue Cross exercised discretion in processing and paying claims were

sufficient to plausibly allege that Blue Cross functioned as plan fiduciary).[7]

It is true that Blue Cross is not simply a third-party administrator; it also independently maintains a network of providers, and negotiates rates with those providers on behalf of its entire book of business according to its own processes and procedures. Under the ASA, Fund participants are allowed to access that PPO network and take advantage of those negotiated rates.

It is doubtful, to say the least, whether Blue Cross's actions in maintaining a network of providers and negotiating payment rates with those providers are sufficient to create a fiduciary status. *See DeLuca v. Blue Cross Blue Shield of Mich.*, 628 F.3d 743, 747 (6th Cir. 2010) (holding that Blue Cross's negotiation of rates with providers, which affected prices paid by ERISA plan, was not a basis for attributing fiduciary status in that case). *But see Peters v. Aetna, Inc.*, 2 F.4th 199, 231 (4th Cir. 2021) (holding that negotiation of rate with subcontractor could give rise to fiduciary status for third-party administrator because administrator had allegedly buried a fee increase within the negotiated rate).

However, that is not the question before the Court. The Fund does *not* contend that Blue Cross's establishment of a provider network and negotiation of rates with those providers made it a functional fiduciary. (Opp'n at 4) ("Plaintiffs do not allege that establishing a network or negotiated rates are fiduciary acts"); (*id.* at 20) ("Plaintiffs' lawsuit is not about the act of negotiating health care service prices."). Rather, the Fund asserts that Blue Cross incurred a fiduciary duty when it "interpreted," and then violated, what it calls the "Negotiated Rate

---

[7] Nonetheless, a third-party administrator may incur fiduciary responsibilities if it exercises other types of discretionary authority. *See, e.g., Golden Star, Inc. v. Massachusetts Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 81-82 (D. Mass. 2014) (holding that third-party administrator of employer-sponsored 401(k) plan was functional fiduciary because it had discretion to set management fee rates); *Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189, 197-99 (D. Mass. 2008) (holding that third-party administrator of employer-sponsored 401(k) plan was a functional fiduciary because it exercised discretion with respect to its own compensation and investment opportunities made available to participants).

Mandate." (*See id.* at 2, 10, 20).

The Plan documents submitted to the Court do not use the term the "Negotiated Rate Mandate." Insofar as the Fund identifies a specific passage as the "Mandate," it points to a single sentence in the SPD—not the Plan, and not the ASA—that informs participants that "[t]he billed charges that will be considered covered expenses will never be more than the negotiated rate." (SPD at 15). The Fund then contends that because the specific rate for each provider is not listed in the SPD, Blue Cross necessarily has authority to "interpret" that sentence by determining what those negotiated rates would be. (Opp'n at 5). It further contends that the complaint is not concerned with the negotiation of rates, but the failure to apply those negotiated rates to claims. (*See* Opp'n at 20) ("What this lawsuit is about is [Blue Cross's] demonstrated failure to apply its own negotiated rates and its consequent violation of the Negotiated Rate Mandate. This has nothing to do with the actual act of negotiation.").

The Fund's argument can thus be summarized as follows. The ASA provides that Blue Cross will serve as a third-party administrator and handle the day-to-day activities of handling claims. Blue Cross did *not* become a functional fiduciary because it handled those functions. The ASA also contemplates that Blue Cross will maintain a preferred provider network and negotiate rates with providers. Blue Cross did *not* become a functional fiduciary because it handled those functions, either. Instead, Blue Cross allegedly became a fiduciary when it "made benefit determinations that exceeded negotiated rates" (Opp'n at 6)—or, to use the language of the complaint, when it violated the "Negotiated Rate Mandate"—thereby causing the Plan to pay excessive amounts for certain claims.

The Plan thus seems to argue that when Blue Cross violated its contractual obligations—because it made mistakes, or refused to fix those mistakes, or otherwise overcharged the Plan—it

stopped acting as a mere third-party administrator, and somehow became a functional fiduciary.

That interpretation is surely incorrect.  For a party to become a functional fiduciary, there must be something in the structure of the relationship, either formally or *de facto*, that takes it outside of the normal plan-administrator relationship.  That "something extra," by statute, means exercising meaningful "discretionary authority or discretionary control respecting the management" of the Plan, or having "discretionary authority or discretionary responsibility in the administration" of the Plan.  29 U.S.C. § 1002(21)(A).  Failing to apply the correct rate to some subset of claims is none of those things.  If Blue Cross did so, it of course may be contractually liable to the Plan.  That does not, however, make it a functional fiduciary.

Put another way, even if the Court were to construe the SPD as imposing a "Negotiated Rate Mandate," Blue Cross did not have the authority to "interpret" that language.  Again, the Fund acknowledges that Blue Cross had the right to maintain its provider network, and negotiate rates, without becoming a functional fiduciary.  Nonetheless, the Fund characterizes the *application* of those rates as an *interpretation* of the SPD.  But Blue Cross was required to apply those rates to the claims of Fund participants; it did not have the discretion to set or apply some other rates.  And when it did so, did not "interpret" the SPD—it executed its obligations under the contract.  Those are non-discretionary, ministerial acts that are insufficient to create a functional fiduciary status.  Indeed, the ASA provides that the Fund has ultimate decision-making authority over all claims.  (ASA at 10) ("In the event an adjudicated claim is appealed . . . the Fund will be responsible to process and make a decision regarding such appeal."); *see Santana*, 920 F. Supp. at 256 (holding that third-party administrator was not fiduciary of ERISA health plan partly because plan sponsor retained ultimate decision-making authority over claims).

The Fund further alleges that Blue Cross's insufficient effort to recover overpayments was both detrimental to the Fund and involved the exercise of discretion.  Of course, Blue Cross exercised some minor degree of discretion under the terms of the ASA with respect to the recovery of erroneously paid specific claims, in the sense that it has the contractual obligation to determine whether mistakenly paid claims should be rectified through normal claim adjustment processes or through settlement agreements with providers.  But that is a far cry from the level of discretion required to transform a third-party administrator into a functional fiduciary.  *See W.E. Aubuchon v. BeneFirst, LLC*, 661 F. Supp. 2d 37, 53 (D. Mass. 2009) (concluding that the "determination of whether and how aggressively to pursue an overpayment to a medical provider" does not involve the exercise of discretion sufficient to confer the status of functional fiduciary on the third-party administrator).

Indeed, if third-party administrators engaged in normal service relationships with plans are in fact functional fiduciaries, significant consequences are likely to result.  ERISA fiduciaries are subject to a variety of restrictions, including a duty of loyalty and prohibitions on certain kinds of transactions.  *See* 29 U.S.C. §§ 1104, 1106.  It is difficult to see how a plan could contract, as here, with a third-party administrator to take advantage of its provider network (and lower rates) under such circumstances.  Presumably, too, third-party administrators will raise their fees substantially to cover both the restricted nature of the business and the additional risk incurred.  Congress cannot have intended such a result, which would provide little, if any, marginal benefit to participants, while imposing substantial additional expenses on plans— expenses that inevitably will be borne largely, if not entirely, by participants through increased fees or reduced benefits.

In summary, Blue Cross does not exercise discretionary authority or discretionary control

respecting the management of the plan, and does not have discretionary authority or discretionary responsibility in the administration of the plan.

### b.      Authority and Control over Plan Assets

Fiduciary status can also be attributed to a third-party administrator when it exercises "any authority or control respecting management or disposition of [plan] assets." 29 U.S.C. § 1002(21)(A). The Fund contends that Blue Cross is a functional fiduciary because it exercises authority or control over the "working capital amount," which it claims is a Fund asset.

Blue Cross first contends that it does not control any Plan assets, because once the Fund pays the monthly working capital amount, it relinquishes any ownership interest in those funds. Alternatively, it contends that even if those funds could be characterized as Plan assets, it does not control or manage them; rather, Blue Cross acts as a depository of the funds and an intermediary that pays claims. It asserts that holding it as a fiduciary for merely possessing Plan assets would be akin to attributing fiduciary status to a depository bank.

Because ERISA lacks any comprehensive definition as to what constitutes a "plan asset," "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law." *In re Fidelity ERISA Float Litig.*, 829 F.3d 55, 60 (1st Cir. 2016) (quoting *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014)).

Here, the ASA provides for the transfer of funds for two principal purposes: to provide "working capital" for the payment of claims and to pay Blue Cross's administrative fees. There is no reason to believe, under "ordinary notions of property rights," that the funds paid to Blue Cross as "working capital amounts" remain the assets of the Fund. The funds are not held in the name of Fund. They are not segregated from other financial assets of Blue Cross, and there is nothing in the ASA that requires them to be. There is no reason to believe that the Fund can have access to those funds, or demand their return, at any time or for any reason. If they were to

22

be embezzled, stolen, or lost, Blue Cross would bear the entire risk.  Blue Cross likewise bears

the risk of any investment loss.  And there is nothing in the ASA that states or suggests that they

are held in trust for the Fund, or for the benefit of the Fund or its participants.  To the contrary,

the ASA indicates that they are paid monthly to Blue Cross "[b]ecause [Blue Cross] will pay

providers of services before being able to bill the Fund"—in other words, to provide Blue Cross

with sufficient capital to pay those bills on a current basis.  (ASA at 16).

    The fact that Blue Cross actually pays the claims—in accordance with the requirements

of the contract, and subject to the approval of the Fund—does not mandate a different result.  As

this Court observed in *W.E. Aubuchon v. BeneFirst, LLC*:

> It is fundamentally inconsistent . . . to hold that a third-party administrator does
> not become a fiduciary merely because it processes and pays claims, but that the
> existence of check-writing authority to execute the claims payment function does
> in fact create such a relationship . . . Accordingly, the exercise of authority over
> bank accounts in the circumstances here is not sufficient to confer the status of a
> 'functional fiduciary' on [the third-party administrator].

661 F. Supp. 2d at 54.

    In short, the ASA sets forth a contractual arrangement that permits claims to be paid on a

timely and current basis without incurring interest costs.  But the fact remains that title to the

funds passes to Blue Cross when the Fund makes its periodic payments, and there is nothing in

the ASA, or otherwise, to suggest the contrary.  *See Depot Inc. v. Caring for Montanans*, 915

F.3d 643, 658-59 (9th Cir. 2019) (concluding that once premium payments were paid to a health

insurer as part of an ERISA-governed employee benefit plan, the plan lost any "beneficial

ownership interest" in the funds and therefore the premiums were not plan assets; instead, they

were payments "in exchange for a contractual right to receive a particular service").

    It is true that the Sixth Circuit reached a different decision under analogous

circumstances in *Hi-Lex Controls Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740 (6th

Cir. 2014).  For the reasons set forth below, this Court disagrees with the reasoning of the *Hi-Lex* court.

*Hi-Lex* involved a dispute as to whether Blue Cross Blue Shield of Michigan ("BCBSM"), as third-party administrator, properly charged certain types of fees to the relevant plan.  The resolution of that dispute required the court to determine whether BCBSM was a "functional fiduciary" within the meaning of the statute.  The central issue appears to have been whether BCBSM exercised "any authority or control respecting management or disposition" of plan assets within the meaning of 29 U.S.C. § 1002(21)(A).[8]  If it did, then it was acting as a functional fiduciary.

The parties in *Hi-Lex* had an apparently typical arrangement in which the sponsor of a self-funded plan collected employee contributions for health benefits, to which it added its own (much larger) employer contribution.  It then sent the combined amount to BCBSM as third-party administrator on a regular, apparently monthly, basis.  From that combined amount, BCBSM paid claims and collected its administrative fees.

The court first noted that the employee contributions—which were collected by the employer from paychecks and segregated from the employer's general assets—were "plan assets" within the meaning of ERISA once the employer had collected them.  751 F.3d at 745.  It then went on to say, without analysis, that the employee contributions "sent to BCBSM to pay claims and administrative costs qualify as plan assets."  *Id*.  It thus assumed away the very

---

[8] The *Hi-Lex* court also addressed whether BCBSM exercised discretion with respect to the disputed fees, apparently in order to ascertain whether it had exercised "discretionary authority or discretionary control respecting management of the plan" or "discretionary authority or discretionary responsibility in the administration of such plan" within the meaning of 29 U.S.C. § 1002(21)(A).  751 F.3d at 744-45.  It apparently concluded that BCBSM did so, noting that certain individual underwriters had the "flexibility to determine 'how and when'' certain disputed fees were charged, and because those fees were sometimes waived.  That led to the counterintuitive conclusion that because BCBSM was occasionally willing to waive its fees for the benefit of the plan—probably as a matter of customer service—it had thereby become a functional fiduciary.  *Id*.

question at the heart of the dispute:  did those plan assets *remain* plan assets once they were

transferred to BCBSM?  If so, why?  If not, why not?

The court then addressed the employer contribution portion of those payments.  *Id*. at

745-47.  It began by citing Department of Labor regulations addressing how the assets of an

ERISA plan were to be determined:

> [T]he assets of an employee benefit plan generally are to be identified on the basis
> of ordinary property rights.  Under this analysis, the assets of a welfare plan
> generally include any property, tangible or intangible, in which the plan has a
> beneficial ownership interest.   Making the plan assets' determination therefore
> requires consideration of any contract or other legal instrument involving the plan,
> as well as the actions and representations of the parties involved.  Furthermore,
> the drawing [of] benefit checks on a TPA account, as opposed to an employer
> account, may suggest to participants that there is an independent source of funds
> securing payment of their benefits under the plan.

*Id.* at 745 (citations and internal quotations omitted).[9]

The court then noted, in substance, that both the SPD and the contract provided that

BCBSM, as third-party administrator, would pay claims out of the funds provided to it by Hi-

Lex, and that there was "no special fund or trust" from which benefits would be paid.  *Id.* at 745-

46.  It noted that Hi-Lex would make the "final claims determination," although enrollees were

required to make initial benefits claims with BCBSM.  *Id.* at 746. After addressing some

relatively collateral matters,[10] the court concluded:

> Collectively, these 'actions and representations' establish that BCBSM, Hi-Lex
> and the company's employees all understood that BCBSM would be holding
> ERISA-regulated funds to pay the health expenses and administrative costs of

---

[9] The First Circuit has adopted the first portion of the DOL definition, stating that the "the assets of a plan
generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law."  *Merrimon*,
758 F.3d at 56; *In re Fidelity ERISA Float Litigation*, 829 F.3d at 60.

[10] For example, the court noted that references to ERISA in plan documents and the plan's requirement that
the third-party administrator annually submit data necessary for completing ERISA-mandated reports undermined
the defendant's argument that the agreement between the parties was simply a service agreement made without
consideration of potential ERISA obligations.  *Id.* at 746. That does not, however, address the question of whether
the funds at issue were assets of the plan under principles of "ordinary property rights."

enrollees in the Hi-Lex Plan.  As a result, Hi-Lex's Plan beneficiaries had a reasonable expectation of a 'beneficial ownership interest' in the funds held by BCBSM.

*Id.*

The court thus did not directly consider whether, as a matter of "ordinary [principles] of property rights," title to the funds had transferred to BCBSM once the plan had made its monthly payment.  There was little discussion of the terms of the contract, other than to note in general terms that BCBSM was required to pay claims out of the amounts transferred.  There was no discussion of who bore the risk of loss after that transfer, or whether (if indeed the plan still held title to the funds) the plan could demand their return.  It did not explain how, as a matter of property law, the reasonable expectation of the beneficiaries (who were not parties to the contract, and presumably had never even read it) appeared to be given substantial weight over the actual terms of the contract.

BCBSM had argued that the funds were not plan assets because they were commingled with other BCBSM funds, as the contract did not require that they be set aside in a segregated account.  *Id.*  But the court brushed that argument aside, noting only that a segregated account was not specifically mandated by law, and that it was possible to retain a beneficial interest without such segregation.  *Id.* at 746-47.  BCSM further argued that the law of trusts provided that "[w]hen one person transfers funds to another, it depends on the manifested intention of the parties whether the relationship created is that of trust or debt."  *Id.* at 747.  But in response, the court simply observed in conclusory terms that the common law supports the conclusion that the funds were held in trust.  *Id.*  It did so even though the contract itself appears to have expressly contemplated a debt relationship, not a trust relationship.

In short, while the desire of the *Hi-Lex* court to protect beneficiaries was no doubt laudable, the court did not actually ground its decision in "ordinary [principles] of property

rights."  Instead, it gave great weight to the fact that BCBSM paid claims out of the funds transferred to it—which is surely a commonplace feature of self-funded benefit plans administered by third-party administrators—and the expectations of the beneficiaries.  And it gave little or no attention to the typical attributes of property rights, such as the actual contractual arrangements of the parties and the allocation of risk.

Furthermore, a broader application of the conclusions in *Hi-Lex* as to plan assets could again produce some potentially far-reaching consequences.  The decision seems to suggest that a self-funded plan and a third-party administrator are nearly powerless to enter into an arrangement that would treat employer and employee contributions as anything other than plan assets, even when neither party intends such a result.  Obviously, claims must be paid somehow, and they must ultimately be paid out of the resources of the plan, directly or indirectly.  Presumably, self-funded plans do not have the necessary administrative capability and expertise to pay a multitude of claims on a daily basis, which is why they engage third-party administrators.  Under *Hi-Lex*, however, third-party administrators who handle claim-payment functions will have difficulty avoiding becoming functional fiduciaries—unless, perhaps, they pay claims in advance out of their own funds.  But if the TPA pays the claims out of its own funds, and bills the plan after the fact, it is in effect playing the role of an unsecured lender to the plan.  The ERISA statute surely does not mandate such a result.

Finally, and in any event, even if the Court were to conclude here that the monthly "working capital" amounts paid to Blue Cross are, in fact, assets of the Plan, that is still insufficient to transform Blue Cross into a functional fiduciary.  ERISA does not "extend fiduciary status to every person who exercises 'mere possession, or custody' over the plan's assets."  *BeneFirst*, 661 F. Supp. 2d at 54 (citation omitted).  Instead, the statute requires that the

putative functional fiduciary exercise "authority or control" as to the management or disposition of a plan's assets.  29 U.S.C. § 1002(21)(A).  A third-party administrator that pays claims according to the instructions of the plan, and subject to its approval, is not exercising discretion and judgment over assets, but performing "purely administrative act[s]."  *Cottrill v. Sparrow, Johnson & Utrillo, Inc.*, 74 F.3d 20, 22 (1st Cir. 1996).  If the funds are in fact assets of the Plan, Blue Cross is acting more in the nature of a depository bank or a custodian than a manager with discretionary authority over assets.  *See Beddall*, 137 F.3d at 20; *O'Toole v. Arlington Tr. Co.*, 681 F.2d 94, 95-96 (1st Cir. 1998).

In summary, the allegations of the complaint are not sufficient to form a plausible basis to conclude that Blue Cross is either a named fiduciary or a functional fiduciary of the Plan.  In particular, Blue Cross is not named as a fiduciary in any Plan document, and is not a functional fiduciary because it does not exercise either discretionary authority and control over the administration and management of the Plan or authority and control respecting the management and disposition of Plan assets.  Counts 1 and 2 therefore fail to state a claim upon which relief can be granted.

### B.   **Injunctive or Equitable Relief**

Count 3 states a claim for injunctive relief for violation of the Plan terms.  Under ERISA, a claim can be stated

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

The Fund contends that the statute provides for relief against any party that violates any plan terms.  Because Blue Cross has violated the "Negotiated Rate Mandate," the Fund reasons,

it has violated plan terms, entitling the Fund to injunctive relief.

The Supreme Court has made clear that both fiduciaries and non-fiduciaries can incur liability under § 1132(a)(3). *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246-47 (2000). However, under § 1132(a)(3), actions against non-fiduciaries must be based on the non-fiduciary's participation in a breach of fiduciary duty. *See id.* at 248-49 (stating the language of § 1132(a)(5) permitted the Secretary of Labor to bring ERISA actions against non-fiduciaries who knowingly participate in fiduciary breaches and that the "similarly worded" § 1132(a)(3) therefore imposed a similar scope of liability). In other words, a claim under § 1132(a)(3) may be brought against a party that is not a fiduciary, but such a party must have participated in a fiduciary breach (ostensibly in concert with a fiduciary) for a claim under § 1132(a)(3) to stand. *See National Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 91 (3d Cir. 2012) ("As the Court in *Harris Trust* explained, [§ 1132(a)(3)] provides a right of action against a transferee of ill-gotten trust assets who is a knowing participant in an ERISA violation.").

Here, for the reasons set forth above, the Fund has failed to allege any fiduciary breach in which Blue Cross may have participated. Accordingly, Count 3 fails to state a claim, and will be dismissed.

### C. State-Law Claims

State-law breach-of-contract claims by plans against third-party administrators are not normally preempted by ERISA. *BeneFirst*, 661 F. Supp. 2d at 46-47. However, "when all federal claims have been dismissed, it is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve the interests of fairness, judicial economy, convenience, and comity." *Zell v. Ricci*, 957 F.3d 1, 15 (1st Cir. 2020) (internal quotation marks omitted) (quoting *Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017)).

Here, the Court finds no compelling reason to retain jurisdiction over this matter.  For the reasons set forth above, this is a dispute concerning contractual obligations arising under state law.  No discovery has been undertaken, and no trial date has been set.  Under the circumstances, the interests of justice do not favor the assertion of supplemental jurisdiction.

Accordingly, those claims will be dismissed without prejudice to their renewal in state court.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the motion to dismiss of defendant Blue Cross Blue Shield of Massachusetts for failure to state a claim upon which relief can be granted is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated: March 30, 2022

30